[8 NE3d 308, 985 NYS2d 193]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ADRIAN P. THOMAS, Appellant.

Argued January 14, 2014; decided February 20, 2014

## POINTS OF COUNSEL

*Jerome K. Frost, P.C.*, Troy (*Jerome K. Frost* of counsel), and *Ingrid Effman*, for appellant. I. The trial court ought to have admitted expert testimony on the subject of police interrogation, coerced confessions, and false confessions to assist the jury in analyzing the 9$^{1}$/$_{2}$-hour video-recorded interrogation of Adrian Thomas, replete with threats, misrepresentations and promises of leniency, given the paucity of evidence connecting Mr. Thomas to any criminal act or establishing that any crime was committed, and thereby assist them in deciding the veracity and voluntariness of Mr. Thomas' confession. (*People v Bedessie*, 19 NY3d 147; *People v Tankleff*, 49 AD3d 160; *Parker v Mobil Oil Corp.*, 7 NY3d 434; *People v Wesley*, 83 NY2d 417; *People v Carroll*, 95 NY2d 375; *People v Taylor*, 75 NY2d 277; *People v Goldstein*, 6 NY3d 119; *Chambers v Mississippi*, 410 US 284; *People v LeGrand*, 8 NY3d 449; *United States v Hall*, 974 F Supp 1198.) II. Mr. Thomas' confession was involuntary under both the United States and New York State Constitutions and under CPL 60.45. (*Garrity v New Jersey*, 385 US 493; *People v Avant*, 33 NY2d 265; *Spevack v Klein*, 385 US 511; *People v Keene*, 148 AD2d 977; *People v Helstrom*, 50 AD2d 685; *People v Aveni*, 100 AD3d 228; *People v Valletutti*, 297 NY 226; *Bram v United States*, 168 US 532; *People v Hilliard*, 117 AD2d 969; *People v Bay*, 76 AD2d 592.) III. Mr. Thomas' confession should be suppressed pursuant to *Dunaway v New York* (442 US 200 [1979]) and *People v Misuis* (47 NY2d 979 [1979]), as the fruit of an illegal arrest. (*People v Chase*, 85 NY2d 493; *People v Balint*, 92 AD2d 348; *People v Anderson*, 46 AD2d 150; *People v Rice*, 309 AD2d 1078.) IV. The prosecution failed to show beyond a reasonable doubt all elements of depraved indifference murder. (*People v Feingold*, 7 NY3d 288; *People v Suarez*, 6 NY3d 202; *People v Kibbe*, 35 NY2d 407; *People v Mills*, 1 NY3d 269; *People v Poplis*, 30 NY2d 85; *People v Roe*, 74 NY2d 20; *People v Mancini*, 7 NY3d 767; *People v Smith*, 41 AD3d 964; *People v Jamison*, 45 AD3d 1438.) V. The trial court erred in providing the jury statutory materials by means of juror note-taking in violation of CPL 310.20 and 310.30. (*People v Miller*, 18 NY3d 704; *People v Hoffler*, 53 AD3d 116; *People v Owens*, 69 NY2d 585; *Rivers v Garden Way*, 231 AD2d 50; *People v Townsend*, 94 AD3d 1330; *People v Baker*, 14 NY3d 266; *People v Johnson*, 181 AD2d 103, 81 NY2d 980; *People v Anderson*, 151 AD2d 335; *People v Tucker*, 77 NY2d 861.)

*Richard J. McNally, Jr., District Attorney*, Troy (*Kelly L. Egan* of counsel), for respondent. I. Whether defendant's statements were the fruits of an unlawful arrest and/or involuntary are mixed questions of fact and law. Because the affirmed findings here are supported by the record, these issues are beyond this Court's limited jurisdiction and provide no basis for reversal of the judgment. (*People v Gonzalez*, 55 NY2d 720; *Matter of Jimmy D.*, 15 NY3d 417; *People v Paulman*, 5 NY3d 122; *People v Centano*, 76 NY2d 837; *People v Bongarzone-Suarrcy*, 6 NY3d 787; *People v Scott*, 86 NY2d 864; *People v Anderson*, 42 NY2d 35; *People v Mateo*, 2 NY3d 383; *People v Williams*, 62 NY2d 285.) II. Defendant's conviction of the depraved indifference murder of his infant son, under Penal Law § 125.25 (4), is amply supported by the evidence when viewed, as it now must be, in the light most favorable to the People. (*People v Martinez*, 20 NY3d 971; *People v Contes*, 60 NY2d 620; *People v Bleakley*, 69 NY2d 490; *People v Ford*, 66 NY2d 428; *New York State Psychiatric Assn., Inc. v New York State Dept. of Health*, 19 NY3d 17; *Rankin v Shanker*, 23 NY2d 111; *People v Feingold*, 7 NY3d 288; *People v Matos*, 19 NY3d 470; *People v Lewie*, 17 NY3d 348; *People v Suarez*, 6 NY3d 202.) III. The trial court's decision, following a hearing, that the jury would not hear from Dr. Ofshe was not an abuse of its discretion. (*People v Cronin*, 60 NY2d 430; *People v Crews*, 18 Misc 3d 1120[A], 2008 NY Slip Op 50145[U], 74 AD3d 983; *People v Knowles*, 88 NY2d 763; *People v Rosario*, 20 Misc 3d 401, 100 AD3d 660; *People v Wesley*, 83 NY2d 417; *People v Wernick*, 89 NY2d 111; *Parker v Mobil Oil Corp.*, 7 NY3d 434; *People v Bedessie*, 19 NY3d 147; *People v LeGrand*, 8 NY3d 449; *People v Bennett*, 79 NY2d 464.) IV. The trial court did not commit reversible error in its response to the jury's request for supplemental instructions in a manner that, it must be presumed, did not prejudice defendant. (*People v Steinberg*, 79 NY2d 673; *People v Malloy*, 55 NY2d 296; *People v Stewart*, 81 NY2d 877; *People v DiLuca*, 85 AD2d 439; *People v Baker*, 14 NY3d 266; *People v Hues*, 92 NY2d 413; *People v Tucker*, 153 AD2d 164, 77 NY2d 861; *People v Owens*, 69 NY2d 585; *People v Anderson*, 151 AD2d 335; *People v Miller*, 18 NY3d 704.)

*Legal Aid Society*, New York City (*Lorca Morello* of counsel), for Legal Aid Society, amicus curiae. I. Appellant's confession should be suppressed as having been coerced by threats, promises, and psychological manipulation that so distorted his perception of his situation as to constitute an overbearing of the will. (*Culombe v Connecticut*, 367 US 568; *Miller v Fenton*, 474

US 104; *People v Anderson*, 42 NY2d 35; *People v Tarsia*, 50 NY2d 1; *Rogers v Richmond*, 365 US 534; *Malloy v Hogan*, 378 US 1; *Weidner v Thieret*, 866 F2d 958; *United States v Rutledge*, 900 F2d 1127; *Dickerson v United States*, 530 US 428; *Arizona v Fulminante*, 499 US 279.) II. Appellant was denied a fair trial when the court precluded expert testimony on false confessions and police interrogation techniques despite his showing that the unreliability of the confession was the heart of his defense; the expert was qualified; the subject was not within the knowledge of the ordinary juror; and the testimony was supported by the consensus of the psychological community. (*Crane v Kentucky*, 476 US 683; *People v Bedessie*, 19 NY3d 147; *People v LeGrand*, 8 NY3d 449; *People v Spicola*, 16 NY3d 441; *People v Lee*, 96 NY2d 157; *People v Cronin*, 60 NY2d 430; *United States v Criden*, 648 F2d 814; *People v Brown*, 97 NY2d 500; *People v Taylor*, 75 NY2d 277; *People v Diaz*, 20 NY3d 569.)

*Adele Bernhard*, New York City, for New York Law School Legal Service Post Conviction Innocence Clinic, amicus curiae. I. Wrongful conviction is an unacceptably serious risk in prosecutions that rest almost entirely upon disputed and untested scientific or medical hypotheses. (*People v Lee*, 96 NY2d 157; *People v Cronin*, 60 NY2d 430; *Parker v Mobil Oil Corp.*, 7 NY3d 434; *Aleman v Village of Hanover Park*, 662 F3d 897.) II. Shaken baby syndrome is a problematic medicolegal hypothesis, both in its original formulation and as refined by emerging medical research. (*Kumho Tire Co. v Carmichael*, 526 US 137; *General Electric Co. v Joiner*, 522 US 136; *Berk v St. Vincent's Hosp. & Med. Ctr.*, 380 F Supp 2d 334.) III. The objective medical evidence in this case suggests that sepsis caused by streptococcus pneumoniae, rather than abuse, caused Matthew Thomas's death. IV. The "diagnosis" of abuse was marred by factual errors that produced biasing information about the cause of Matthew Thomas's death. V. A confession or incriminating statement is not scientific evidence of the presence or absence of a disease or cause of death when it is contradicted by laboratory tests and clinical findings. (*Harris v Thompson*, 698 F3d 609.)

*Wilmer Cutler Pickering Hale & Dorr LLP*, Washington, D.C. (*David W. Ogden, Daniel S. Volchok* and *Sonya L. Lebsack* of counsel), and *Nathalie F.P. Gilfoyle*, for American Psychological Association, amicus curiae. I. Expert testimony regarding false confessions assists jurors in understanding critical evidence. (*People v LeGrand*, 8 NY3d 449; *Miranda v Arizona*, 384 US

436; *United States v Shay*, 57 F3d 126; *People v Lee*, 96 NY2d 157; *People v Cronin*, 60 NY2d 430; *People v Carroll*, 95 NY2d 375; *People v Bedessie*, 19 NY3d 147; *United States v Hall*, 93 F3d 1337; *People v Taylor*, 75 NY2d 277; *Crane v Kentucky*, 476 US 683.) II. Expert testimony regarding false confessions is reliable because it is based on established scientific research. (*People v Wesley*, 83 NY2d 417; *People v LeGrand*, 8 NY3d 449; *Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 US 579; *United States v Hall*, 974 F Supp 1198; *Kumho Tire Co. v Carmichael*, 526 US 137; *General Electric Co. v Joiner*, 522 US 136; *People v Taylor*, 75 NY2d 277.) III. Expert testimony about false confessions is particularly critical where there is a lack of corroborating evidence. (*People v LeGrand*, 8 NY3d 449.)

*Milbank, Tweed, Hadley & McCloy LLP*, New York City (*Dorothy Heyl* and *LaTonya Brooks* of counsel), for Innocence Network, amicus curiae. I. The interrogation of Adrian Thomas produced a coerced and unreliable confession. (*People v Guilford*, 21 NY3d 205; *People v Anderson*, 42 NY2d 35; *People v De Jesus*, 63 AD2d 148; *People v Zimmer*, 68 Misc 2d 1067, 40 AD2d 955; *People v Leonard*, 59 AD2d 1; *Spano v New York*, 360 US 315; *Haynes v Washington*, 373 US 503; *People v Lyons*, 4 AD3d 549; *Rogers v Richmond*, 365 US 534; *Lynumn v Illinois*, 372 US 528.) II. When a disputed confession is admitted into evidence, expert testimony on false confessions must be allowed as a necessary safeguard to prevent wrongful convictions. (*People v LeGrand*, 8 NY3d 449; *People v Santiago*, 17 NY3d 661; *Colorado v Connelly*, 479 US 157; *People v Wesley*, 83 NY2d 417; *Parker v Mobil Oil Corp.*, 7 NY3d 434; *People v Diaz*, 20 NY3d 569; *De Long v County of Erie*, 60 NY2d 296; *Selkowitz v County of Nassau*, 45 NY2d 97; *People v Cronin*, 60 NY2d 430.) III. This Court should require the videotaping of complete interrogations in order that courts can adequately assess voluntariness and reliability. (*People v Bedessie*, 19 NY3d 147.)

*Kathleen M. Rice, District Attorney*, Mineola (*Hilary Hassler* and *Vincent Rivellese* of counsel), for District Attorneys Association of the State of New York, amicus curiae. During an interrogation after a valid *Miranda* waiver, some police deception can be an appropriate investigative tool. Courts should continue to look to the totality of the circumstances to determine whether a statement is voluntary, and a statement should not be "deemed" involuntary on the basis of deceptive police conduct that did not coerce it. (*Culombe v Connecticut*, 367 US 568; *Arizona v Fulminante*, 499 US 279; *Schneckloth v Bustamonte*,

412 US 218; *Dickerson v United States*, 530 US 428; *Lego v Twomey*, 404 US 477; *People v Huntley*, 15 NY2d 72; *New York v Quarles*, 467 US 649; *Harris v New York*, 401 US 222; *Berkemer v McCarty*, 468 US 420; *People v Anderson*, 42 NY2d 35.)

*Sharon L. McCarthy*, New York City, *Susan Hoffinger, K. Babe Howell, Christopher Ferguson, Angie Louie* and *Terri Rosenblatt* for New York City Bar Association, amicus curiae. I. The combination of threats, promises, and lies used to persuade Adrian Thomas to adopt the police-generated confession narrative renders the "confession" involuntary under the totality of the circumstances. (*People v Anderson*, 42 NY2d 35; *Rogers v Richmond*, 365 US 534; *Greenwald v Wisconsin*, 390 US 519; *Haynes v Washington*, 373 US 503; *Lynumn v Illinois*, 372 US 528; *Spano v New York*, 360 US 315; *People v Guilford*, 21 NY3d 205; *People v Holland*, 48 NY2d 861; *People v Helstrom*, 50 AD2d 685, 40 NY2d 914; *People v Keene*, 148 AD2d 977.) II. Deception regarding the medical necessity of information to save the life of a loved one is "offensive to a civilized system of justice" and violates due process. (*Miller v Fenton*, 474 US 104; *Haynes v Washington*, 373 US 503; *People v Aveni*, 100 AD3d 228, 20 NY3d 1059; *Rogers v Richmond*, 365 US 534; *People v Tarsia*, 50 NY2d 1; *People v Anderson*, 42 NY2d 35; *Spano v New York*, 360 US 315.) III. The adversarial system relies upon the ability of the parties to present witnesses on critical issues at trial to achieve accurate outcomes; the denial of an expert on false confessions undermines this principle. (*People v Bedessie*, 19 NY3d 147; *People v Pepper*, 53 NY2d 213; *United States v Hall*, 974 F Supp 1198; *People v Lee*, 96 NY2d 157; *People v Jones*, 73 NY2d 427; *People v Cronin*, 60 NY2d 430; *Crane v Kentucky*, 476 US 683; *Washington v Texas*, 388 US 14; *Chambers v Mississippi*, 410 US 284; *People v Carroll*, 95 NY2d 375.)

## OPINION OF THE COURT

Chief Judge LIPPMAN.

■ Defendant was convicted by a jury of murdering his four-month-old son, Matthew Thomas. The evidence considered by the jury included a statement in which he admitted that on three occasions during the week preceding the infant's death he "slammed" Matthew down on a mattress just 17 inches above the floor and a videotape of defendant's interrogation, near the

end of which defendant, a particularly large individual,[1] demonstrated how he raised the infant above his head and threw him down with great force on the low-lying mattress. The jury also heard testimony from the child's treating doctors from Albany Medical Center, the medical examiner who performed the autopsy on Matthew, and an expert on child abuse from Brown Medical School. These witnesses, citing radiologic and postmortem findings of subdural fluid collections, brain swelling and retinal hemorrhaging, as well as defendant's account of what he had done, said that Matthew died from intracranial injuries caused by abusively inflicted head trauma. Although defendant argued at trial and on appeal that the proof before the jury was insufficient to support a verdict finding him guilty of depraved indifference murder (Penal Law § 125.25 [4])—the theory charged—the argument was correctly rejected. Defendant's written and videotaped confession together with the evidence presented by the prosecution's medical experts sufficed to demonstrate that defendant, with depraved indifference to human life, recklessly engaged in conduct which created a grave risk of serious physical injury to the four-month-old infant and thereby caused the child's death. Although there may have been uncertainty at the time of defendant's trial and prior appeal as to whether a one-on-one killing of a helpless infant by an adult through the infliction of physical abuse could qualify as depraved indifference murder, it is now settled that it can (*see People v Barboni*, 21 NY3d 393, 403 [2013]), rendering defendant's argument to the contrary unavailing. That the evidence was sufficient to support the conviction, however, does not end the inquiry we are assigned on this appeal before us by leave of a Judge of this Court (19 NY3d 1105 [2012]), since there is a persisting issue of law as to whether the jury should have had before it all the evidence it did. Inasmuch as we conclude that defendant's inculpating statements were not demonstrably voluntary, we reverse the order of the Appellate Division affirming defendant's conviction (93 AD3d 1019 [3d Dept 2012]), grant defendant's previously denied motion to suppress those statements, and direct a new trial.

I.

On the morning of September 21, 2008, defendant's wife, Wilhelmina Hicks, awoke to discover that the couple's four-month-old,

---

1. At the time of the events in question, defendant weighed well over 300 pounds.

prematurely born infant, Matthew, was limp and unresponsive. Emergency assistance was immediately summoned and the child was rushed to Samaritan Hospital in Troy, New York. There, he presented with a range of symptoms, including a low white blood cell count, irregular heartbeat, low blood pressure, severe dehydration and respiratory failure. The most likely differential diagnosis was noted by the treating emergency room doctor as septic shock, although intracranial injuries were also listed to be ruled out. Blood tests to confirm sepsis were performed, but their results were not immediately available. Meanwhile, the child was placed on massive doses of antibiotics.

In the early afternoon, Matthew was transferred to the Pediatric Intensive Care Unit at Albany Medical Center, where he continued to be treated for sepsis. The child's treating physician concluded that his patient had been a victim of blunt force trauma—indeed, that the by-then moribund child had been "murdered." (At the trial of the case, this doctor and other prosecution experts testified that blunt force trauma was indeed the cause of death; defense experts disputed this, attributing the death to sepsis, and the defense suggested that the treating doctor was misled by his initial impression, later proved wrong, that the child's skull was fractured.) He so informed local child protective and law enforcement authorities on the evening of September 21st.

At the hearing upon defendant's motion to suppress his inculpating statements, the course of the ensuing investigation was described through the testimony of Troy Police Sergeant Adam Mason and the video recording of defendant's entire interrogation was placed in evidence. Mason stated that, based on the report that Matthew had been physically abused, he accompanied child protective workers to defendant's home and assisted in the removal of defendant's six other children.[2] Defendant, who had been caring for the children while his wife was at the hospital with Matthew, remained at his residence subsequent to the removal. Hours later, the police returned and escorted defendant to an interrogation room at the Troy Central Police Station. There, they read the evidently distraught father his rights and commenced a course of videotaped interrogation. The interrogation lasted about $9^{1/2}$ hours, broken into an initial two-hour and a subsequent $7^{1/2}$-hour session. In between, defendant,

---

**2.** There was no evidence that any of these other children were themselves abused or neglected.

having expressed suicidal thoughts during the initial interview, was involuntarily hospitalized pursuant to Mental Hygiene Law § 9.39 for some 15 hours in a secure psychiatric unit. By prearrangement, he was released back to his interrogators who immediately escorted him back to the police station where the interrogation resumed.

The premise of the interrogation was that an adult within the Thomas-Hicks household must have inflicted traumatic head injuries on the infant. Indeed one of the interrogating officers told defendant that he had been informed by Matthew's doctor that Matthew had been "slammed into something very hard. It's like a high speed impact in [a] vehicle. This baby was murdered . . . [T]his baby is going to die and he was murdered." The interrogators, however, repeatedly reassured defendant that they understood Matthew's injuries to have been accidental. They said they were not investigating what they thought to be a crime and that once defendant had told them what had happened he could go home. He would not, they reassured over and again, be arrested. When, however, defendant continued to deny having hurt Matthew, even accidentally, the officers falsely represented that his wife had blamed him for Matthew's injuries and then threatened that, if he did not take responsibility, they would "scoop" Ms. Hicks out from the hospital and bring her in, since one of them must have injured the child. By the end of the initial two-hour interrogation, defendant agreed to "take the fall" for his wife. He said that he had not harmed the child and did not believe that his wife had either because "she is a good wife," but that he would take responsibility to keep her out of trouble.

Before the interrogation recommenced on the evening of September 22d, Matthew was pronounced brain dead. Nonetheless, the interrogating officers told defendant that he was alive and that his survival could depend on defendant's disclosure of how he had caused the child's injuries:

> "SERGEANT MASON: The doctors need to know this. Do you want to save your baby's life, all right? Do you want to save your baby's life or do you want your baby to die tonight?
>
> "[DEFENDANT]: No, I want to save his life.
>
> "SERGEANT MASON: Are you sure about that? Because you don't seem like you want to save your

baby's life right now. You seem like you're beating around the bush with me.

"[DEFENDANT]: I'm not lying.

"SERGEANT MASON: You better find that memory right now Adrian, you've got to find that memory. This is important for your son's life man. You know what happens when you find that memory? Maybe if we get this information, okay, maybe he's able to save your son's life. Maybe your wife forgives you for what happened. Maybe your family lives happier ever after. But you know what, if you can't find that memory and those doctors can't save your son's life, then what kind of future are you going to have? Where's it going to go? What's going to happen if Matthew dies in that hospital tonight, man?"

About four hours into the second interrogation session defendant gave a statement. He said that, about 10 or 15 days before, he accidentally dropped Matthew five or six inches into his crib and Matthew hit his head "pretty hard." He supposed that that impact caused Matthew's brain injury. He also recalled accidentally bumping Matthew's head with his head on the evening of September 20th. He noticed that Matthew's breathing became labored, but was afraid to tell his wife what happened. Defendant would expand upon this statement, but before he did so a second officer, Sergeant Colaneri, entered the interrogation room. He claimed to have had experience with head injuries during his military service in Operation Desert Storm, and angrily accused defendant of lying—he said that Matthew's injuries could only have resulted from a far greater application of force than defendant had described. Matthew's doctors, he reported, had stated that the child's head injuries were comparable to those that would have been sustained by a passenger in a high-speed car collision. After Colaneri left, Sergeant Mason, said that he felt betrayed by defendant's untruthfulness and that he was doing all he could to stop his superior from having defendant arrested. Although he would acknowledge in his hearing testimony that he did not then have probable cause for defendant's arrest, he represented to defendant that he was defendant's last hope in forestalling criminal charges. He said that he could not help defendant unless defendant told him how he had caused Matthew's injuries. He proposed that defendant had been depressed and emotionally overwhelmed after having

been berated by his wife over his chronic unemployment and that, out of frustration, he had, without intending to harm the infant, responded to his crying by throwing him from above his head onto a low-lying mattress.[3] He emphasized several times that, according to the doctor at the hospital, the child would have had to hit the mattress at a speed of 60 miles per hour to sustain the injuries from which he was suffering. He had defendant demonstrate with a clipboard how he threw the child down on the mattress, instructing:

> "Move that chair out of the way. Here hold that like you hold the baby. Turn around, look at me. Now here's the bed right here, all right. Now like I said, the doctor said that this injury is consistent with a 60 mile per hour vehicle crash, all right, all right. That means it was a very severe acceleration. It means he was going fast and stopped suddenly, all right, so think about that. Don't try to downplay this and make like it's not as severe as it is. Because [we] both know now you are finally starting to be honest, okay, all right. Maybe this other stuff you said is the truth.

> "[DEFENDANT]: That is.

> "SERGEANT MASON: For what the information that I need to know we both know now you are starting to finally be honest with that, all right. Hold that like you hold that baby, okay and start thinking about them negative things that your wife said to you, all right, start thinking about them kids crying all day and all night in your ear, your mother-in-law nagging you and your wife calling you a loser, all right, and let that aggression build up and show me how you threw Matthew on you bed, all right. Don't try to sugar coat it and make it like it wasn't that bad. Show me how hard you threw him on that bed."

The ensuing enactment conforming to the Sergeant's directions was captured on the interrogation video. Defendant then enlarged upon his prior statement, now admitting that, under circumstances precisely resembling those specified by Mason, he

---

3. The officer suggested that defendant had thrown the child down on his mattress after defendant adamantly denied throwing the child against a hard surface, i.e., the wall or the floor.

threw Matthew down on his mattress on the Wednesday, Thursday and Saturday preceding the child's hospitalization.

Defendant's motion to suppress his written and videotaped statements on the ground that they were not voluntary, but had been extracted by means of threats and misrepresentations to which he was specially vulnerable by reason of physical and emotional exhaustion, and upon the ground that the police tactics used during the interrogation created a substantial risk of false incrimination, was denied. In the decision and order we now review, the Appellate Division upheld the denial of suppression reasoning that the People met their burden at the *Huntley* hearing to prove defendant's confession voluntary beyond a reasonable doubt (93 AD3d at 1026) and, relatedly, that the ploys and misrepresentations of defendant's interrogators were not so serious as to offend due process (*id.*). The court found that the threat to arrest Ms. Hicks was "reasonable" (*id.* at 1028), and that the misrepresentation that Matthew's life depended upon defendant's disclosure of the manner in which he had caused the child's injuries did not offend due process because it would not have elicited unreliable information. In the latter connection the court observed that "common sense dictates the . . . conclusion . . . that parents, aware of their child's life threatening predicament, would *accurately* disclose any information that might enable doctors to save their child" (*id.* at 1027). As to the officers' many reassurances that what was involved was an accident and that defendant would not be arrested—indeed, that he would be returning home—the court was of the view that they reflected the officers' beliefs at the time they were given (*id.* at 1027-1028).

## II.

It is the People's burden to prove beyond a reasonable doubt that statements of a defendant they intend to rely upon at trial are voluntary (*People v Guilford*, 21 NY3d 205, 208 [2013]). To do that, they must show that the statements were not products of coercion, either physical or psychological (*see Miranda v Arizona*, 384 US 436, 448 [1966]), or, in other words, that they were given as a result of a "free and unconstrained choice by [their] maker" (*Culombe v Connecticut*, 367 US 568, 602 [1961]). The task is the same where deception is employed in the service of psychologically oriented interrogation; the statements must be proved, under the totality of the circumstances (*see Guilford*, 21 NY3d at 208)—necessarily including

any potentially actuating deception—the product of the maker's own choice. The choice to speak where speech may incriminate is constitutionally that of the individual, not the government, and the government may not effectively eliminate it by any coercive device. It is well established that not all deception of a suspect is coercive, but in extreme forms it may be. Whether deception or other psychologically directed stratagems actually eclipse individual will, will of course depend upon the facts of each case, both as they bear upon the means employed and the vulnerability of the declarant. There are cases, however, in which voluntariness may be determined as a matter of law—in which the facts of record permit but one legal conclusion as to whether the declarant's will was overborne (*see e.g. Guilford, supra*). This, we believe, is such a case. What transpired during defendant's interrogation was not consonant with, and, indeed, completely undermined, defendant's right not to incriminate himself—to remain silent.

### III.

Most prominent among the totality of the circumstances in this case is the set of highly coercive deceptions. They were of a kind sufficiently potent to nullify individual judgment in any ordinarily resolute person and were manifestly lethal to self-determination when deployed against defendant, an unsophisticated individual without experience in the criminal justice system.

It is established that interrogators may not threaten that the assertion of Fifth Amendment rights will result in harm to the interrogee's vital interests. In *Garrity v New Jersey* (385 US 493 [1967]), police officers were convicted of conspiracy to obstruct justice on the basis of confessions made after the officers were threatened with the loss of their jobs if they asserted their Fifth Amendment rights. The Court held that the confessions were "infected by the coercion inherent in the scheme of questioning" and thus impossible to sustain as voluntary (*id.* at 496-498). In *People v Avant* (33 NY2d 265 [1973]) this Court, following *Garrity*, held that municipal contractors could not be pressured to make incriminating disclosures by threatening forfeiture of the right to bid on municipal contracts if they did not. Recognizing the breadth of the principle informing *Garrity*, Judge Breitel stated

> "While there was once a different view, it is now
> . . . undisputed that one may not be 'coerced' into

waiving his constitutional privilege by the withholding of a substantial right to engage in one's occupation *or of any other substantial or fundamental exercise of life, liberty, and the pursuit of happiness* (*Gardner* v. *Broderick*, 392 U. S. 273, 279, *supra*; *Garrity* v. *New Jersey*, 385 U. S. 493, 497)" (*id.* at 273 [Breitel, J., concurring] [emphasis supplied]).

It was not consistent with the rule of *Garrity* and *Avant* to threaten that if defendant continued to deny responsibility for his child's injury, his wife would be arrested and removed from his ailing child's bedside. While the People and the Appellate Division viewed this threat as "reasonable," the issue is not whether it reflected a reasonable investigative option, but whether it was permissibly marshaled to pressure defendant to speak against his penal interest. It was not. And, although the Appellate Division treated the threat as benign because defendant did not finally provide a complete confession until many hours had passed, it is clear that defendant's agreement to "take the fall"—an immediate response to the threat against his wife—was pivotal to the course of the ensuing interrogation and instrumental to his final self-inculpation.

Another patently coercive representation made to defendant—one repeated some 21 times in the course of the interrogation—was that his disclosure of the circumstances under which he injured his child was essential to assist the doctors attempting to save the child's life. We agree with the Appellate Division, and it is in any case self-evident, that these were representations of a sort that would prompt any ordinarily caring parent to provide whatever information they thought might be helpful, even if it was incriminating. Perhaps speaking in such a circumstance would amount to a valid waiver of the Fifth Amendment privilege if the underlying representations were true, but here they were false. These falsehoods were coercive by making defendant's constitutionally protected option to remain silent seem valueless and respondent does not plausibly argue otherwise. Instead, it is contended that they did not render defendant's ensuing statements involuntary because there was no substantial risk that appealing to defendant's fatherly concern would elicit a false confession. It has long been established that what the Due Process Clause of the Fourteenth Amendment forbids is a coerced confession, regardless of whether it is likely to be true. In *Rogers v Richmond* (365 US 534 [1961, Frankfurter, J.]) the Court explained:

"Our decisions under that Amendment have made clear that convictions following the admission into evidence of confessions which are involuntary, *i.e.*, the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth. To be sure, confessions cruelly extorted may be and have been, to an unascertained extent, found to be untrustworthy. But the constitutional principle of excluding confessions that are not voluntary does not rest on this consideration. Indeed, in many of the cases in which the command of the Due Process Clause has compelled us to reverse state convictions involving the use of confessions obtained by impermissible methods, independent corroborating evidence left little doubt of the truth of what the defendant had confessed. Despite such verification, confessions were found to be the product of constitutionally impermissible methods in their inducement. Since a defendant had been subjected to pressures to which, under our accusatorial system, an accused should not be subjected, we were constrained to find that the procedures leading to his conviction had failed to afford him that due process of law which the Fourteenth Amendment guarantees" (*id.* at 540-541 [citations omitted]).

It is true that our state statute (CPL 60.45 [2] [b] [i]) treats as "involuntarily made" a statement elicited "by means of any promise or statement of fact, which promise or statement creates a substantial risk that the defendant might falsely incriminate himself," but this provision does not, and indeed cannot, displace the categorical constitutional prohibition on the receipt of coerced confessions, even those that are probably true (*see Rogers*, 365 US at 545 n 3 ["whether the question of admissibility is left to the jury or is determinable by the trial judge, it must be determined according to constitutional standards satisfying the Due Process Clause of the Fourteenth Amendment"]). As CPL 60.45's enumeration of the various grounds

upon which a statement may be deemed involuntary itself demonstrates, subdivision (2) (b) (i) constitutes an additional ground for excluding statements as "involuntarily made," not a license for the admission of coerced statements a court might find reliable.

Additional support for the conclusion that defendant's statements were not demonstrably voluntary, under the totality of the circumstances, can be found in the ubiquitous assurances offered by defendant's interrogators, that whatever had happened was an accident, that he could be helped if he disclosed all, and that, once he had done so, he would not be arrested, but would be permitted to return home. In assessing all of the attendant circumstances, these assurances cannot be minimized on the basis that the eventual confession admitted behavior that could not be characterized as accidental. It is plain that defendant was cajoled into his inculpatory demonstration by these assurances—that they were essential to neutralizing his often expressed fear that what he was being asked to acknowledge and demonstrate was conduct bespeaking a wrongful intent. Defendant unquestionably relied upon these assurances, repeating with each admission that what he had done was an accident. These assurances, however, were false. From its inception, defendant's interrogation had as its object obtaining a statement that would confirm the hypothesis that the infant had been murdered through physical abuse. That objective was incompatible with any true intermediate representation that what defendant did was just an accident. Had there been only a few such deceptive assurances, perhaps they might be deemed insufficient to raise a question as to whether defendant's confession had been obtained in violation of due process. This record, however, is replete with false assurances. Defendant was told 67 times that what had been done to his son was an accident, 14 times that he would not be arrested, and eight times that he would be going home. These representations were, moreover, undeniably instrumental in the extraction of defendant's most damaging admissions. When Sergeant Mason suggested that defendant had thrown Matthew down on the bed, defendant protested repeatedly that he was being asked to admit that he had intentionally harmed his son. To each such protest, Mason responded that what defendant had done was not intentional, often adding an elaborate explanation of why that was so. In this way, and after a final appeal from Mason to provide the "proper information to relate to the hospital and talk to the

doctors to keep your son alive," defendant at last agreed that he argued with Ms. Hicks and then threw Matthew down on the bed. Based on that admission, he would be prosecuted for murder. We do not decide whether these police techniques would themselves require suppression of defendant's statements, but that they, taken in combination with the threat to arrest his wife and the deception about the child, reinforce our conclusion that, as a matter of law, defendant's statements were involuntary.

## IV.

■ Defendant's inculpating statements were also inadmissible as "involuntarily made" within the meaning of CPL 60.45 (2) (b) (i). The various misrepresentations and false assurances used to elicit and shape defendant's admissions manifestly raised a substantial risk of false incrimination. Defendant initially agreed to take responsibility for his son's injuries to save his wife from arrest. His subsequent confession provided no independent confirmation that he had in fact caused the child's fatal injuries. Every scenario of trauma induced head injury equal to explaining the infant's symptoms was suggested to defendant by his interrogators. Indeed, there is not a single inculpatory fact in defendant's confession that was not suggested to him. He did not know what to say to save his wife and child from the harm he was led to believe his silence would cause. It was at Mason's request and pursuant to his instructions that defendant finally purported to demonstrate how he threw the child. And after Mason said that he must have thrown the child still harder and after being exhorted not to "sugar coat" it, he did as he was bid. Shortly after this closely directed enactment, defendant was arrested.

Defendant's admissions were not necessarily rendered more probably true by the medical findings of Matthew's treating physicians. The agreement of his inculpatory account with the theory of injury advanced by those doctors can be readily understood as a congruence forged by the interrogation. The attainment of the interrogation's goal, therefore, cannot instill confidence in the reliability of its result.

Inasmuch as we conclude that defendant's confession should not have been placed before the jury, there is no need to address whether defendant's expert should have been permitted to testify about the phenomenon of false confession and the interrogation techniques employed to elicit defendant's admissions.

Accordingly, the order of the Appellate Division should be reversed, defendant's motion to suppress statements granted and a new trial ordered.

Judges GRAFFEO, READ, SMITH, PIGOTT, RIVERA and ABDUS-SALAAM concur.

Order reversed, defendant's motion to suppress statements granted and a new trial ordered.