People v Cipriani (2025 NY Slip Op 06758)

People v Cipriani

2025 NY Slip Op 06758

Decided on December 4, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:December 4, 2025

112294
[*1]The People of the State of New York, Respondent,
v
Timothy Cipriani, Appellant.

Calendar Date:October 9, 2025

Before:Garry, P.J., Clark, Aarons, Lynch and Powers, JJ.

G. Scott Walling, Slingerlands, for appellant.
Robert M. Carney, District Attorney, Schenectady (Christopher D. Horn of counsel), for respondent.

Clark, J.
Appeal from a judgment of the County Court of Schenectady County (Matthew Sypniewski, J.), rendered December 18, 2019, upon a verdict convicting defendant of the crimes of burglary in the third degree and petit larceny.
In connection with an alleged burglary on July 12, 2018 at the Fu Sing restaurant in the Town of Rotterdam, Schenectady County, defendant was charged by indictment with burglary in the third degree and petit larceny.[FN1] County Court denied defendant's pretrial motion to preclude the People from mentioning his parole status at trial and to suppress certain statements he made during a police interview in connection with the investigation. Following a jury trial, defendant was convicted as charged. He was sentenced, as a persistent felony offender, to a prison term of 15 years to life on the burglary conviction, with a lesser concurrent jail term on the petit larceny conviction. Defendant appeals.
Defendant challenges the verdict on legal sufficiency and weight of the evidence grounds, arguing that the proof did not establish his identity as the perpetrator of the crimes.[FN2] We disagree. "In conducting a legal sufficiency analysis, this Court views the evidence in the light most favorable to the People and evaluates whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crimes charged" (People v Lall, 223 AD3d 1098, 1100 [3d Dept 2024] [internal quotation marks, brackets and citations omitted], lv denied 41 NY3d 984 [2024]; see People v Clark, 43 NY3d 1052, 1052 [2025]). By contrast, when conducting a weight of the evidence review, we "must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and then, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Ashe, 208 AD3d 1500, 1501 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 961 [2022]; see People v Alger, 206 AD3d 1049, 1050-1051 [3d Dept 2022], lv denied 38 NY3d 1148 [2022]). This review entails viewing the evidence in a neutral light and affording deference to the jury's credibility determinations (see People v Ashe, 208 AD3d at 1501; People v Furman, 152 AD3d 870, 875 [3d Dept 2017], lv denied 30 NY3d 1060 [2017]).
As charged here, "[a] person is guilty of burglary in the third degree when he [or she] knowingly enters or remains unlawfully in a building with intent to commit a crime therein" (Penal Law § 140.20). "A person is guilty of petit larceny when he [or she] steals property" (Penal Law § 155.25). "As an implicit but necessary element of each and every crime, the People must prove beyond [*2]a reasonable doubt the identity of the defendant as the person who committed the crime" (People v Rivera, 239 AD3d 1045, 1046 [3d Dept 2025] [internal quotation marks and citations omitted], lv denied 43 NY3d 1058 [2025]).
At trial, the owner of the subject restaurant testified that he closed the restaurant at 10:00 p.m. on July 11, 2018. When he arrived the next morning, the bars covering a window on the east side of the building were on the floor inside of the restaurant and approximately $500 was missing from the cash register and the cashier's box. Police obtained video footage from surveillance cameras inside and outside of the establishment, which depicted the underlying event. At approximately 5:16 a.m. on July 12, 2018, an exterior camera captured a person wearing a hoodie walking in the direction of the restaurant appearing to talk on the phone. A minute later, a surveillance camera located at a Sunoco gas station across the street from the restaurant captured footage of a person wearing similar clothing walking toward the restaurant and stopping in front of a window on the east side of the building. Although the footage does not clearly depict this person breaking the grate covering the window, the person can be seen standing in front of the window for some time before disappearing inside of the premises. The cameras inside of the restaurant captured footage of a person wearing a hoodie crawling on the floor of the restaurant at 5:20 a.m. on the date in question, rummaging under the counter, opening the cash register and appearing to take something out of it. The person can also be seen looking under the register, locating a cashier's box and trying to break into it. The person then crawls back into the kitchen area out of view. At 5:28 a.m., the camera located at the Sunoco gas station captured footage of what appears to be the same person reemerging from the window and quickly walking down the sidewalk out of view.
A detective who arrived at the restaurant around lunchtime on July 12, 2018 testified that "[i]t appeared that someone had pulled the [window] bars back to make entry into the window." This detective also located additional surveillance footage from exterior pole cameras located in the vicinity of the restaurant, which captured footage of a red pickup truck circling the block near the establishment twice during the relevant time frame, once around 5:17 a.m. and again around 5:20 a.m. At 5:29 a.m., a pole camera captured a person wearing a hoodie walk past the restaurant on Curry Road and turn down Pauline Avenue out of view. Approximately 20 seconds later, a different camera located on Pauline Avenue captured footage of a red pickup truck pull over on the side of the road while the person wearing the hoodie walked toward it. The individual then got into the passenger side of the vehicle, which drove away.
Police identified the license plate number of the red pickup truck through a still image generated from one of the surveillance [*3]videos, establishing to whom it was registered. Upon closer examination of the still image, police believed that the vehicle owner's husband, Christopher Shambo, was the person driving the vehicle on the date in question. When police made contact with Shambo and showed him images from the time frame in question, he admitted that he and defendant were "in that area trying to get drugs." This information led to defendant becoming a person of interest in the burglary.
After obtaining information that defendant was on parole, a detective responsible for investigating the burglary contacted defendant's parole officer. The parole officer located defendant at his sister's home on July 15, 2018. The parole officer testified that defendant failed to appear for his scheduled parole check-in on the date of the burglary. Upon locating defendant, police escorted him to the police station for an interview, during which he explained that he was "getting high" with a friend on the morning of the burglary. Notably, defendant identified the friend as "Chris" during the interview, revealed that Shambo's wife had a truck and revealed that he and Shambo met a drug dealer in the Town of Rotterdam on the date in question. Defendant maintained that he spent "several days on the run" getting high before returning home on July 14, 2018. When defendant was asked to watch the video of an individual wearing a hoodie getting into the red pickup truck on Pauline Avenue around 5:30 a.m. on the day of the incident, he did not definitively identify himself as the person in the hoodie but indicated that it was him. Later during the interview, defendant stated: "you see me walking back to the truck" and "you see that [I have] nothing in my hands."
The People also admitted evidence of a recorded phone call defendant made from jail on July 16, 2018, during which he stated to a female recipient, "Honey, I saw the videos this guy's got, if the kid that I was with never said anything . . . I don't know why he said I was with him . . . there's no way to identify that person [walking]." Defendant also stated on the call, "When I go to court tonight I'm gonna say I have no idea what they're talking about. That's not me."
Viewing the foregoing evidence in the light most favorable to the People — particularly the surveillance footage and defendant's statements on the telephone call from jail — there is a valid line of reasoning and permissible inferences from which a rational jury could conclude beyond a reasonable doubt that defendant perpetrated the break-in at Fu Sing and that he stole $500 from the establishment (see People v Rivera, 239 AD3d at 1047-1048; People v Alexander, 231 AD3d 1310, 1312 [3d Dept 2024]). Accordingly, the verdict is supported by legally sufficient evidence. As for the weight of the evidence, although a different verdict would not have been unreasonable considering defendant's explanation during his police interview that he was only in the area on the morning of [*4]the burglary to buy drugs, the jury rejected this explanation when it convicted defendant. The proof amply supported the jury's credibility determination in this regard. In addition to establishing a forcible entry into the restaurant and that a sum of money was taken therefrom, the timestamps from each of the surveillance videos created a cohesive timeline to establish that the individual in the hoodie who entered into and took money from the restaurant was the same individual who entered the red pickup truck after the burglary that was later identified as being driven by Shambo. Given the foregoing evidence, coupled with defendant's statements during the police interview and on the phone call from jail, we conclude that the People proved defendant's identity as the perpetrator of the burglary beyond a reasonable doubt. Accordingly, the verdict is supported by the weight of the evidence (see People v Henry, 169 AD3d 1273, 1274 [3d Dept 2019], lv denied 33 NY3d 1070 [2019]; People v Edmonds, 165 AD3d 1494, 1496-1497 [3d Dept 2018]).
Contrary to defendant's contention, County Court properly declined to suppress his statements made during the July 15, 2018 police interview, as the record does not support his claim that his statements were coerced. "Evidence of a written or oral confession, admission, or other statement made by a defendant with respect to his [or her] participation or lack of participation in the offense charged, may not be received in evidence against him [or her] in a criminal proceeding if such statement was involuntarily made" (CPL 60.45 [1]). "[O]n a motion to suppress, the People bear the burden of proving beyond a reasonable doubt that the defendant's statements to police were voluntarily given, including that any custodial interrogation was preceded by the administration and the defendant's knowing waiver of his or her Miranda rights" (People v High, 200 AD3d 1209, 1210 [3d Dept 2021] [internal quotation marks, brackets and citations omitted], lv denied 37 NY3d 1161 [2022]; see People v Thomas, 22 NY3d 629, 641-642 [2014]; People v Parker, 224 AD3d 777, 779-780 [2d Dept 2024]). A statement is involuntarily made if it is obtained, in relevant part, "[b]y a public servant engaged in law enforcement activity or by a person then acting under his [or her] direction or in cooperation with him [or her] . . . by means of any promise or statement of fact, which promise or statement creates a substantial risk that the defendant might falsely incriminate himself [or herself]" (CPL 60.45 [2] [b] [i]; see People v Erfurt, 234 AD3d 1120, 1123 [3d Dept 2025], lv denied 43 NY3d 1008 [2025]). Whether a statement given to police is voluntary "is a factual issue governed by the totality of the circumstances and the credibility assessments of the suppression court in making that determination are entitled to deference" (People v High, 200 AD3d at 1210 [internal quotation marks and citations omitted]; see People v Cruz, 138 AD3d 1310, 1311 [3d Dept [*5]2016]).
The evidence presented at the Huntley hearing established that defendant's parole officer — accompanied by another parole officer and a police detective — located defendant at his sister's residence on July 15, 2018. Defendant, who was sleeping at the time, was awoken, placed in handcuffs and informed that the detective wanted to speak with him. While defendant was in the patrol vehicle being transported to the police station, he inquired about why a detective wanted to talk to him. In response, the parole officer told defendant that he was a "person of interest in something" and that he would "appreciate
. . . whatever information [defendant] c[ould] give th[e] detective," explaining that defendant's "cooperation could help . . . at [his] parole violation hearing should [he] be violated." The parole officer confirmed during the hearing that no parole warrant had been issued by that point and that defendant "knew that at the end of the night it was going to be a phone call to [the parole officer's] boss . . . to . . . determine[ ] if [defendant] was going to be violated right then and there or be released back to his sister's residence." He further testified that he did not make any promises to defendant pertaining to his cooperation with investigators and that defendant did not appear to be under the influence of drugs or alcohol during their conversation.
Once at the police station, defendant was escorted to an interview room and his handcuffs were removed. Defendant again inquired as to what the police detective wanted to speak with him about and the parole officer repeated that he had "no idea," but that, if defendant was cooperative, then "maybe" he could call his boss relative to the parole violation. The detective was not in the interview room at that time. When the detective returned to the interview room, he administered Miranda warnings to defendant, who refused to sign the written Miranda card but confirmed that he understood his rights since he had been through the process before. Defendant further stated that he did not usually talk to police, but that he would make an exception in this case. The detective then commenced his questioning of defendant. A few minutes into the interview, the parole officer emphasized that defendant had failed to report for parole supervision and again stated that he would "appreciate anything [defendant could] do," stating that, if he was cooperative in answering the detective's questions, the parole officer would "make a phone call to [his] boss," which "maybe [would] go[ ] a long way with what's going to happen . . . with the parole thing." Everyone but the detective and defendant then stepped out of the interview room and the detective recommenced his questioning, eliciting the inculpatory statements from defendant identifying Shambo's red pickup truck as the vehicle depicted in the surveillance footage in the vicinity of the Fu Sing restaurant on the date of the burglary and explaining that [*6]he was with Shambo that morning.
Upon considering the totality of the circumstances, we agree with County Court that the People proved beyond a reasonable doubt that defendant's statements to the police detective were voluntarily made and were not the product of coercion. Defendant's parole officer did not make any definitive promises to defendant, merely emphasizing that, if he cooperated with the detective, the parole officer would make a phone call to his boss, which would "maybe" help defendant with respect to his failure to report for parole supervision. The parole officer's statements to that effect did not render the circumstances "inherently coercive or overbearing" (People v Lowndes, 167 AD3d 1228, 1230 [3d Dept 2018]). Moreover, this was not a situation of "an unsophisticated individual without experience in the criminal justice system" (People v Thomas, 22 NY3d at 642). To the contrary, defendant had extensive familiarity with the police interview process, was read his Miranda rights and revealed that he knew that he did not have to speak to police but would make an exception in this case. On this record, we conclude that County Court properly denied defendant's motion to suppress his statements to the detective (see People v Hatch, 230 AD3d 908, 915 [3d Dept 2024], lv denied 42 NY3d 1020 [2024]; People v Weber, 226 AD3d 1158, 1160 [3d Dept 2024], lv denied 42 NY3d 931 [2024]).
We are also unpersuaded by defendant's challenge to County Court's Molineux ruling permitting the People to present evidence that he was on parole at the time of the instant crimes and that he had failed to appear at his regularly scheduled parole appointment on the date in question (see People v Young, 168 AD3d 771, 772 [2d Dept 2019], lv denied 33 NY3d 955 [2019]; People v Lownes, 40 AD3d 1269, 1270 [3d Dept 2007], lv denied 9 NY3d 878 [2007]). Such information provided necessary background information to explain the parole officer's involvement in the case, completed the narrative regarding the inability to locate defendant following the burglary and was inextricably interwoven into the narrative pertaining to the circumstances in which police eventually made contact with him (see People v Savery, 209 AD3d 1268, 1269 [4th Dept 2022], lv denied 39 NY3d 1075 [2023]). Any prejudice to defendant was mitigated by County Court's limiting instruction to the jury explaining that defendant's parole status was "no proof whatsoever that he possessed the propensity or disposition . . . to commit the crimes charged in this case" (see People v Lownes, 40 AD3d at 1270).
Defendant also challenges County Court's denial of his request to terminate the proceedings to designate him a persistent felony offender, arguing that the People failed to comply with applicable statutory requirements, that the relevant statutes are unconstitutional and that, as applied in this case, sentencing him as a persistent felony offender was unduly harsh and severe. Although defendant's arguments [*7]are preserved for appellate review, they are unavailing. CPL 400.20 enumerates the procedure that "must be followed in order to impose the persistent felony offender sentence authorized by" Penal Law § 70.10 (2) (CPL 400.20 [1]). Such procedure includes, in relevant part, filing with the clerk of the court an "order directing a hearing to determine whether the defendant should be sentenced as a persistent felony offender . . . not less than [20] days" before the date of that hearing (CPL 400.20 [3]). Annexed to that order, the filing court must include a statement setting forth the "dates and places of the previous convictions which render the defendant a persistent felony offender . . . [and] factors in the defendant's background and prior criminal conduct which the court deems relevant for the purpose of sentencing the defendant as a persistent felony offender" (CPL 400.20 [3] [a], [b]). Upon the filing of such order, the clerk of the court "must send a notice of hearing to the defendant, his counsel and the district attorney" (CPL 400.20 [4]). "[S]trict compliance with the statute [is] not required inasmuch as [a] defendant receive[s] reasonable notice of the accusations against him [or her] and [is] provided an opportunity to be heard with respect to those accusations during the persistent felony offender proceeding" (People v Williams, 163 AD3d 1422, 1424 [4th Dept 2018] [internal quotation marks and citation omitted]; see People v Sedore, 227 AD3d 1452, 1453 [4th Dept 2024], lv denied 42 NY3d 940 [2024]; People v Sanders, 194 AD3d 652, 653 [1st Dept 2021], revd on other grounds 39 NY3d 216 [2023]; People v Mateo, 101 AD3d 1458, 1461 [3d Dept 2012], lv denied 21 NY3d 913 [2013]).
On May 23, 2019, County Court filed a notice of its intent to hold a persistent felony offender hearing on June 26, 2019. The People's written statement set forth the dates and locations of defendant's prior felony convictions to support the designation and was filed with the Clerk of the Court. However, the precise date of that filing is unclear. The record also does not directly establish if and when the notice and accompanying statement were served on defendant. Nevertheless, defense counsel subsequently filed a motion, dated June 24, 2019, to terminate the proceedings, thereby demonstrating that he was provided with notice. In his accompanying papers, defense counsel argued, among other things, that the statutory service requirements of CPL 400.20 had not been followed. He also challenged the statute's use of the preponderance of the evidence standard to establish the requirement that "the defendant's history and character and the nature and circumstances of his criminal conduct" (CPL 400.20 [5]) warrant an enhanced sentence, arguing that the People should be required to prove this element beyond a reasonable doubt and that a jury should make the determination.
During the June 26, 2019 appearance originally scheduled for the persistent felony offender hearing, [*8]County Court postponed the proceedings until after defendant's upcoming trial on a separate indictment.[FN3] Thereafter, on October 30, 2019, County Court reissued the notice of the persistent felony offender hearing, to take place November 20, 2019. The People also refiled their statement pursuant to CPL 400.20 (3), dated October 21, 2019. Although there is no affidavit of service in the record establishing if and when these documents were served upon defendant or his counsel, during the November 20, 2019 hearing, County Court revealed that the order, the notice and the People's statement had been provided to defendant and his attorney, that "reservice" had been executed on October 30, 2019, and that the procedural service defects had been remedied. Defense counsel did not dispute as much.
After conducting a hearing, County Court properly denied defendant's motion to terminate the proceedings to designate him a persistent felony offender, as the procedural defects had been remedied, the People substantially complied with the statutory scheme and defendant received notice of the proceedings and had an opportunity to be heard (see People v Sedore, 227 AD3d at 1453; People v Williams, 163 AD3d at 1424). Defendant's constitutional challenges also lack merit, as the Court of Appeals, on numerous occasions, has determined that this sentencing scheme regarding persistent felony offender status does not run afoul of the NY or US Constitutions, rejecting the same constitutional arguments raised here (see People v Prindle, 29 NY3d 463, 465 [2017], cert denied 583 US 1019 [2017]; People v Quinones, 12 NY3d 116, 125-130 [2009], cert denied 558 US 821 [2009]; People v Rivera, 5 NY3d 61, 66-71 [2005], cert denied 546 US 984 [2005]; People v Rosen, 96 NY2d 329, 333-335 [2001], cert denied 534 US 899 [2001]).
Defendant also challenges the sentence imposed by County Court. Although he does not deny that he qualifies as a persistent felony offender, he argues that County Court abused its discretion in sentencing him as such and that the sentence imposed is unduly harsh and severe, emphasizing that his prior felony convictions were for low level, nonviolent offenses. After reviewing the presentence report and considering all relevant circumstances, we discern no basis upon which to disturb the sentencing court's finding that defendant should be sentenced as a persistent felony offender to an aggregate prison term of 15 years to life. Defendant has an extensive criminal history spanning much of his adult life, including numerous convictions for larcenous offenses. Several of these prior offenses were committed while defendant was on parole supervision, demonstrating that he was previously undeterred by shorter prison sentences. On the record before us, we find that the sentence is not unduly harsh or severe (see CPL 470.15 [6] [b]; People v Pointer, 206 AD3d 1232, 1236 [3d Dept 2022], lv denied 38 NY3d 1152 [2022]; People v Durham, 148 AD3d 1293, 1296 [3d Dept 2017], [*9]lv denied 29 NY3d 1091 [2017]). Defendant's remaining contentions, to the extent not expressly addressed, have been considered and found lacking in merit.
Garry, P.J., Aarons, Lynch and Powers, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: The indictment also named Christopher Shambo as a codefendant and contained additional counts pertaining to an alleged burglary at a different establishment in the Town of Niskayuna, Schenectady County. The trial proceeded only with respect to defendant, and the counts pertaining to the Niskayuna burglary were dismissed upon defendant's motion for a trial order of dismissal at the close of the People's case-in-chief.

Footnote 2: Defendant's legal sufficiency argument is adequately preserved for appellate review (see People v Cuadrado, 227 AD3d 1174, 1175 [3d Dept 2024], lv denied 42 NY3d 969 [2024]).

Footnote 3: The sentencing hearing pertained to two different indictments against defendant, which were tried separately but joined for sentencing purposes. The sentences imposed on the two indictments were to run concurrently with one another.