## Supreme Court, Appellate Division
### Third Judicial Department

Decided and Entered:  March 17, 2016                    105527
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                        Respondent,

        v                                   MEMORANDUM AND ORDER

MICHAEL J. SCARINGE,
                        Appellant.
_____

Calendar Date:  January 6, 2016

Before:  McCarthy, J.P., Garry, Rose and Devine, JJ.

_____

        Barry J. Jones, Hudson Falls, for appellant.

        Craig P. Carriero, District Attorney, Malone (Jennifer M. Hollis of counsel), for respondent.

_____

Garry, J.

        Appeal from a judgment of the County Court of Franklin County (Rogers, J.), rendered August 24, 2012, upon a verdict convicting defendant of the crimes of rape in the second degree, sexual abuse in the second degree and endangering the welfare of a child.

        In the fall of 2009, defendant, who was then 61 years old, was hired as the director of the Saranac Lake Youth Center, a community agency that provided an after-school gathering place for children and teenagers.  Shortly thereafter, he befriended a 13-year-old Youth Center client (hereinafter the victim) by, among other things, buying her gifts and exchanging text messages with her.  He also provided various forms of assistance to her family.  In December 2009, defendant brought the victim to his

home in the Town of Harrietstown, Franklin County, directed her into his bedroom, removed her clothes, placed and guided her hand on his penis, and inserted his penis into her vagina.  Defendant was indicted on charges of rape in the second degree, sexual abuse in the second degree (two counts) and endangering the welfare of a child.  One of the charges of sexual abuse in the second degree was dismissed before trial.  Following a mistrial and a second jury trial, defendant was convicted of the remaining charges and sentenced to an aggregate prison term of seven years, followed by seven years of postrelease supervision.  Defendant appeals.

County Court did not err in denying defendant's motion to dismiss the indictment on constitutional and statutory speedy trial grounds.  Whether the People have complied with their statutory obligation to declare their readiness for a felony trial within six months of the commencement of a criminal action is "determined by computing the time elapsed between the filing of the first accusatory instrument and the People's declaration of readiness, subtracting any periods of delay that are excludable under the terms of the statute and then adding to the result any postreadiness periods of delay that are actually attributable to the People and are ineligible for an exclusion" (People v Cortes, 80 NY2d 201, 208 [1992]; accord People v Pope, 96 AD3d 1231, 1232 [2012], lv denied 20 NY3d 1064 [2013]; see CPL 30.30 [1] [a]).  Here, the six-month period, comprising 181 days, began to run when the felony complaint was filed on January 1, 2010 (see People v Cortes, 80 NY2d at 207 n 3; People v Lowman, 103 AD3d 976, 976-977 [2013]).  The People declared readiness at defendant's arraignment on June 23, 2010.[1]  That date fell less than 181 days after the felony complaint was filed.  We further agree with the People that they are entitled to exclude an additional prereadiness period resulting from an adjournment of

_____

[1]  The People had previously declared readiness in a memorandum filed on June 7, 2010, but did not submit proof that they served this memorandum upon defense counsel or notified him of its filing (see People v Kendzia, 64 NY2d 331, 337 [1985]).  Their brief upon appeal does not challenge defendant's contention that the later date is therefore controlling.

the grand jury proceeding.  "[T]he People bear the burden of establishing their entitlement to exclude any prereadiness delays from the calculation under a CPL 30.30 motion and, as such, must ensure that the record is sufficiently clear as to who is chargeable for a delay" (People v Smith, 110 AD3d 1141, 1142 [2013] [internal quotation marks and citations omitted]; see People v Seamans, 85 AD3d 1398, 1399 [2011]).  Here, the People submitted correspondence showing that defense counsel and the District Attorney agreed to a 35-day adjournment of the grand jury proceeding.  This time period is excludable, as defense counsel's consent was "clearly expressed" (People v Smith, 110 AD3d at 1143 [internal quotation marks and citation omitted]); however, no such consent was shown as to any other adjournments (see People v Smith, 82 NY2d 676, 678 [1993]; People v Battaglia, 187 AD2d 808, 810 [1992]).

The total period of prereadiness delay is thus well under 181 days, and we reject defendant's contention that the People nevertheless failed to comply with their statutory obligation because of subsequent postreadiness delay.  The People moved for reconsideration of County Court's prior order dismissing one of the charges of sexual abuse in the second degree and for permission to amend the indictment or, alternatively, for leave to re-present the charges to another grand jury.  The court subsequently issued an order that denied reconsideration but granted leave to the People to re-present the charges; nine days later, the People advised the court that they would not do so. Contrary to defendant's contention, the fact that the People sought the alternative relief of re-presentment neither renders their motion equivalent to a request for adjournment nor requires these time periods to be charged to the People.  Delay resulting from a court's consideration of pretrial motions is not chargeable to the People (see CPL 30.30 [4] [a]; People v Moorhead, 61 NY2d 851, 852 [1984]), and a decision by the People to seek a superseding indictment — or here, their consideration of whether to do so — does not render illusory a previous statement of readiness, which "is presumed to be . . . accurate and truthful" (People v Miller, 113 AD3d 885, 887 [2014] [internal quotation marks and citation omitted]; see People v Galloway, 93 AD3d 1069, 1070 [2012], lv denied 19 NY3d 996 [2012]).  Accordingly, the People complied with their statutory

speedy trial obligations.  Finally, we find no constitutional violation.  The extent of the delay was not "extraordinary" (People v Romeo, 12 NY3d 51, 56 [2009] [internal quotation marks and citations omitted], cert denied 558 US 817 [2009]).  It resulted primarily from pretrial motions filed by both parties, the underlying charges were serious, defendant was not incarcerated before trial, and he showed no impairment or prejudice to his defense (see People v Taranovich, 37 NY2d 442, 446-447 [1975]; People v Pitt, 43 AD3d 1248, 1248-1249 [2007], lv denied 9 NY3d 1008 [2007]).

Contrary to defendant's claim, County Court properly refused to suppress statements that defendant made to police investigators before he invoked his right to counsel.  It is the People's burden to prove that a defendant's statements to police were voluntary and were not the product of unduly coercive or deceptive police conduct, an analysis based upon the totality of the circumstances (see People v Guilford, 21 NY3d 205, 208 [2013]; People v Neal, 133 AD3d 920, 922 [2015], lvs denied 26 NY3d 1110, 1107 [2016]).  Here, police investigators asked defendant to speak with them about an unspecified investigation. In response to this request, defendant transported himself to the police station, and the investigators immediately administered Miranda warnings to him.  Defendant confirmed that he understood his rights and was "absolutely" willing to speak with police. The investigators did not immediately disclose the true purpose of the ensuing two-hour interview, but instead discussed various other topics before asking defendant directly about the victim and her accusations.  Deceptive police conduct may be unduly coercive, but only when it is so "extreme" that it overbears a defendant's individual will (People v Thomas, 22 NY3d 629, 642 [2014]).  Here, nothing in the investigators' mildly misleading interviewing technique was so deceitful as to undermine the voluntariness of defendant's choice whether to speak with them (see People v Moore, 132 AD3d 496, 496-497 [2015]; People v Dallas, 119 AD3d 1362, 1363 [2014], lv denied 24 NY3d 1083 [2014]; People v Lloyd, 118 AD3d 1117, 1119 [2014], lv denied 25 NY3d 951 [2015]).  Defendant requested an attorney soon after the investigators began to focus the questioning on the victim's accusations, belying his contention that the earlier "social conversation" had so diluted his awareness of his rights that the

warnings should have been re-administered (People v Cox, 21 AD3d 1361, 1363 [2005] [internal quotation marks omitted], lv denied 6 NY3d 753 [2005]; see People v Sanders, 295 AD2d 639, 639 [2002], lv denied 98 NY2d 771 [2002]).

Defendant's convictions were not against the weight of the evidence. The victim testified that she and defendant talked and spent time together and that he often gave her rides to her home, school athletic events and cheerleading practice. During these rides, defendant would sometimes try to kiss the victim or "massage" her arm. She said that she would "try to block it out" when he touched her, that it "wasn't comfortable feeling all the time [and] it was kind of creepy in some ways." She stated, however, that she thought of defendant as a friend and believed that she loved him "[b]ecause he would always buy me, like, gifts and make me feel like really close . . . like he cared for me but not in a daughter way but like friends."

Defendant bought several gifts for the victim, such as a costume for a Halloween dance and Christmas gifts, including clothing and a stuffed animal.[2] He also gave the victim a prepaid cell phone with minutes already loaded on it, and sent her an email directing her to use text messaging rather than email for any "important or private" messages to him. Defendant later told police that he obtained permission for this gift from the victim's mother, but the mother denied that she knew about the phone before the victim came home with it. The victim stated that she had previously used her mother's cell phone to communicate with defendant, but had deleted the messages so that her mother would not find out about them. After defendant gave her the phone, she used it to communicate with him "[p]retty much daily," and defendant replenished the phone's minutes when necessary.

---

[2]   According to a police investigator, defendant stated that he selected only the victim to buy Christmas gifts for, even though there were other young clients who also needed them, because he could not afford to buy gifts for them all and "had to choose the child that gives you the most bang for your buck."

On Wednesday, December 23, 2009, the victim was picked up at her home by an employee of a local youth advocacy group to attend a meeting, and she was thereafter transported by this employee to the Youth Center. The employee testified that she had intended to drive the victim home afterwards, but the victim asked if defendant could do so, and defendant "insisted" that he was traveling in that direction anyway. Accordingly, the employee obtained the mother's permission for defendant to drive her home. Defendant later offered a different explanation, telling police that he drove the victim home because the employee was unwilling to drive in wintry weather. The victim testified that after she left with defendant, he stopped at his house to pick up luggage for a trip that he was about to take. The victim initially remained in the car, but defendant then asked her to come inside and go upstairs to get a suitcase. When she did so, he "nudged" her into his bedroom, removed her clothes and his own, placed her hand on his penis, got on top of her and had intercourse with her. She testified that she was "partially okay with [the encounter]" at first, but that the intercourse was painful, so she asked defendant to stop. He did not do so. Afterward, defendant took her home. The victim stated, "I still felt like we were friends and I liked and, like, loved him." In the next several days, he and the victim exchanged multiple affectionate text messages in which they repeatedly stated that they loved each other, sometimes abbreviated with the acronym "ILY."

Several days later, the victim's mother discovered a text message from defendant on the victim's phone that read in part, "ILY you a million times, last Sunday was a dream come true and so was Wednesday before I left."[3] The mother confronted the victim; she denied at first that anything had happened, but upon further questioning, and being asked whether defendant had raped her, she answered that he had. The mother then contacted police. The victim initially told police and a sexual assault nurse examiner that defendant had forced her to have intercourse with him, but after additional police questioning, she stated that no

---

[3] Defendant had taken the victim shopping to purchase the cell phone and other gifts on the previous Sunday.

force was used. At trial, she testified that she did not initially tell the whole truth because she was afraid that she would get into trouble, believed that it was somehow her fault, and did not want her mother to think less of her. The People presented the testimony of a psychologist, qualified as an expert in the field of child and adolescent sexual abuse, who opined that children who are subjected to sexual abuse may wish to keep the abuse secret and find it difficult to talk about. He stated that partial disclosure of sexual abuse can occur when victims are confronted before they are psychologically ready to make a full disclosure, and that a child may have conflicted feelings about a sexual abuser and want to continue the beneficial aspects of the relationship despite the abuse.

The sexual assault nurse examiner testified that she obtained the victim's medical history, examined her and performed various tests, but did not try to collect DNA evidence because too much time had passed. The victim was diagnosed with a urinary tract infection; the nurse stated that one of the most common causes of this condition is sexual intercourse. The pelvic examination revealed contusions and redness that the nurse described as consistent with the victim's description of the incident. Asked on cross-examination whether some of these findings could have been caused by a tampon, she stated this was possible but "highly unlikely."

A police investigator with expertise in retrieving data from cell phones testified that he examined both defendant's phone and the cell phone that defendant had given to the victim and initially found no relevant text messages. However, by using specialized software, the investigator was able to recover about 70 deleted messages between defendant and the victim. In addition to mutual messages of love, the texts included repeated requests from the victim not to tell her mother that they were texting each other. In one message, defendant stated that he missed the victim and would "jingle" her phone later to let her know that he loved her. In another, he responded, "me tooooo" to a message from the victim stating that she loved him. The investigator also recovered deleted pictures from defendant's phone, including a photo taken in the Youth Center office, showing the victim sitting in defendant's lap with their faces

close together.  The victim testified that defendant took this picture when she and defendant were in his office and alone in the building; defendant had told police that clients did not enter his office.

Defendant did not testify, but the police investigators who interviewed him stated that he acknowledged that he knew the victim "very well," had occasionally given her rides, had taken her shopping and had driven her home on December 23, 2009.  He claimed, however, that the victim had remained outside on the back porch throughout the visit.  He further acknowledged that he and the victim had exchanged text messages, although he claimed that he never initiated them and merely responded to her.  He admitted that he had told the victim that he loved her, stating that this "was just terminology that everyone used."  Several witnesses testified on defendant's behalf to call into question the credibility of the victim and her mother, including one witness who testified that he asked the victim on social media whether she "had [defendant] arrested for accusations of rape," to which the victim responded that nothing had happened and asked him to keep it secret, and two witnesses who said that they had heard the mother state that she could sue defendant and the Youth Center.  The former witness, however, acknowledged on cross-examination that he had a criminal history that included a conviction for making a false statement, and the latter witnesses admitted that they had hostile relationships with the victim and her mother.  Deferring to the jury's credibility assessments and viewing the evidence in a neutral light, we find that the weight of the admissible evidence amply supported the verdict (see People v Romero, 7 NY3d 633, 643-644 [2006]; People v Fisher, 126 AD3d 1048, 1050-1051 [2015]; People v Clevenstine, 68 AD3d 1448, 1450 [2009], lv denied 14 NY3d 799 [2010]).

However, we agree with defendant that certain Molineux evidence pertaining to defendant's alleged prior sexual contacts with young girls should not have been admitted.  It is beyond dispute that evidence of a defendant's prior bad acts may not be admitted solely to establish his or her bad character or propensity to commit the charged crime (see People v Agina, 18 NY3d 600, 603 [2012]; People v Arafet, 13 NY3d 460, 464-465 [2009]).  When such evidence is relevant to "a proper

nonpropensity purpose, the decision whether to admit [it] . . . rests upon the trial court's discretionary balancing of probative value and unfair prejudice" (People v Dorm, 12 NY3d 16, 19 [2009]; see People v Barreto, 64 AD3d 1046, 1049 [2009], lv denied 13 NY3d 834 [2009]).  Here, the People moved before trial for permission to offer, among other things, the testimony of four adult female witnesses that defendant had sexual contact with them during the 1970s when he was employed as their music teacher and they were between 12 and 14 years old.  The People asserted that defendant had singled out and obtained the trust of each of these students by such means as complimenting and flattering them, and had then had sexual contact with them that, in at least one case, included intercourse.  County Court (Main Jr., J.) issued a pretrial Molineux ruling allowing the People to use the evidence as part of their case-in-chief.  During the second jury trial, County Court (Rogers, J.) eventually granted defense counsel's repeated requests to reconsider the earlier decision and narrowed the prior ruling.  The court found that the testimony was not relevant to the charges of rape in the second degree or sexual abuse in the second degree, as defendant's intent to commit these crimes could be inferred from commission of the acts themselves, but that it was relevant to the mens rea element of the charge of endangering the welfare of a child.  The court reasoned that defendant's actions in buying gifts for the victim and exhibiting other kindnesses to her and her family were noncriminal and could have been intended for purposes other than gaining the victim's trust and inducing her to engage in sexual acts with him.  The four witnesses were thus permitted to testify, but the court gave the jury limiting instructions directing them to consider the evidence only as to the mental state for the endangering charge, and not to consider it as to the other two charges or for the purpose of determining whether defendant had a propensity or predisposition to commit the crime.

        In our view, this ruling was error.  For the purposes of this argument, we assume without deciding that the People are correct in their contention that they were required to prove the mental state that defendant had when he committed seemingly generous acts towards the victim in the lead up to the sexual assault.  However, the requisite analysis balancing the testimony's probative value against its potential for prejudice

does not appear on the record.  Such an analysis may be implied where, as here, a court limits the admission of the evidence based upon a record that includes defense counsel's vigorous opposition to a Molineux application (see People v Milot, 305 AD2d 729, 731 [2003], lv denied 100 NY2d 585 [2003]).  Even if such an analysis may be implied here, the probative value of the testimony for the limited purpose of showing defendant's mental state in doing kindnesses for the victim was highly limited.  The alleged prior bad acts were extremely remote in time, taking place decades previously.  Further, there were significant factual differences between the actions that defendant allegedly took to gain the trust of his earlier alleged victims and those he used with the victim.  By contrast, the prejudicial impact of the testimony – consisting of descriptions of multiple reprehensible acts allegedly committed by defendant against vulnerable children – was significant.  As such, and despite the limiting instructions with which County Court attempted to minimize the resulting prejudice, we find that the prejudicial impact of the proof so outweighed its limited probative value that it should not have been admitted (see People v Brown, 114 AD3d 1017, 1020 [2014]; People v Buskey, 45 AD3d 1170, 1174 [2007]).

        Nonetheless, we do not find that reversal is required.  The admissible proof of defendant's guilt is overwhelming, and "there is no view of the evidence which would suggest a significant probability that defendant would have been acquitted but for the wrongful admission of this evidence" (People v Newkirk, 75 AD3d 853, 857 [2010] [internal quotation marks and citation omitted], lv denied 16 NY3d 834 [2011]; see People v Crimmins, 36 NY2d 230, 242 [1975]).  Defendant challenged the victim's credibility based primarily upon her admission that, when first confronted, she claimed that defendant had forcibly raped her.  However, although the victim later acknowledged that this part of her initial account was false, the People offered explanatory expert testimony, and the victim never withdrew her underlying claim that defendant had sexual contact and intercourse with her.  The victim's testimony was corroborated by physical evidence that she sustained injuries consistent with sexual intercourse and, most significantly, by the multiple text messages introduced into evidence in which defendant, among many other things, described

the day on which the victim claimed that they had sexual intercourse as "a dream come true."  This evidence and the other proof — in particular, the evidence that defendant singled out the victim to receive his attentions and gifts, kept his communications with her secret from the mother, gave her a cell phone, kept it replenished with minutes, instructed her to use it for "private" messages, sent her inappropriate messages and permitted and encouraged her to do the same, and photographed her sitting on his lap — are consistent with the 13-year-old victim's account of events and entirely inconsistent with the 61-year-old defendant's professional responsibilities or with any innocent explanation.  Accordingly, we find that the error is harmless and no new trial is required (see People v White, 41 AD3d 1036, 1038 [2007], lv denied 9 NY3d 965 [2007]).

Defendant's remaining claims may be briefly addressed.  He did not receive the ineffective assistance of counsel.  Although defendant's first defense counsel made inappropriate comments during his opening statement, precipitating a mistrial, he nevertheless provided vigorous pretrial representation by, among other things, obtaining dismissal of one of the sexual abuse charges.  Defendant's second defense counsel obtained adjournments and other relief from County Court to enable her to prepare for trial, and thereafter made persuasive and cogent opening and closing statements, vigorously cross-examined the People's witnesses, made effective objections and obtained the previously-discussed reconsideration and narrowing of the Molineux ruling.  Her alleged failure to consult or hire an expert witness on the issue of pediatric sexual abuse is not evident from the record and, thus, is not properly raised on direct appeal (see People v Hernandez, 125 AD3d 885, 887 [2015], lv denied 26 NY3d 968 [2015]; People v Miller, 81 AD3d 854, 855 [2011], lv denied 16 NY3d 861 [2011]).  As for defendant's claim that neither his first nor his second defense counsel obtained adequate discovery, the record reveals that an open file discovery procedure was employed (see People v Clarke, 110 AD3d 1341, 1346 [2013], lv denied 22 NY3d 1197 [2014]).  Accordingly, defendant received "meaningful representation" (People v Baldi, 54 NY2d 137, 147 [1981]).

Finally, we wholly reject defendant's claim that his seven-

year sentence is harsh and excessive.  The record provides no evidence of vindictiveness or other support for defendant's assertion that he was penalized for exercising his right to reject a plea offer and proceed to trial (see People v Pena, 50 NY2d 400, 412 [1980], cert denied 449 US 1087 [1981]; People v Acevedo, 118 AD3d 1103, 1108 [2014], lv denied 26 NY3d 925 [2015]).  In view of the nature of defendant's crimes and his abuse of a position of authority to induce the 13-year-old victim to engage in sexual contact with him, we find no abuse of discretion or extraordinary circumstances warranting any modification of the sentence (see People v Gibson, 2 AD3d 969, 973-974 [2003], lv denied 1 NY3d 627 [2004]; People v White, 261 AD2d 653, 658 [1999], lv denied 93 NY2d 1029 [1999]).

McCarthy, J.P., Rose and Devine, JJ., concur.


ORDERED that the judgment is affirmed.




ENTER:

Robert D. Mayberger
Clerk of the Court