*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  February 23, 2017                106011
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                        Respondent,

        v                                    MEMORANDUM AND ORDER

ISAIAH M. JEREMIAH, Also Known
    as EYES,
                        Appellant.
_____

Calendar Date:   January 18, 2017

Before:  McCarthy, J.P., Garry, Lynch, Devine and Mulvey, JJ.

_____

        Teresa C. Mulliken, Harpersfield, for appellant.

        John M. Muehl, District Attorney, Cooperstown (Jason P.
Weinstein of New York Prosecutors Training Institute, Inc.,
Albany, of counsel), for respondent.

_____

Garry, J.

        Appeal from a judgment of the County Court of Broome County
(Cawley, J.), rendered December 14, 2012, upon a verdict
convicting defendant of the crimes of murder in the first degree,
murder in the second degree (two counts), robbery in the first
degree and criminal possession of a weapon in the second degree.

        After concerned relatives asked police to check on the
victim's welfare, his dead body, with a gunshot wound in the
head, was found in an apartment in the City of Binghamton, Broome
County.  Two days later, detective Carl Peters and investigator
Charles Woody Jr. of the Binghamton Police Department traveled
with other officers to Brooklyn.  In the course of the

investigation, they interviewed Kevin Kennedy, who ultimately gave a statement implicating defendant in the crime.  Woody, Peters and two or three other officers went to the Brooklyn apartment of the mother of defendant's girlfriend, who advised them that defendant was present.  Peters spoke with defendant in the apartment before transporting him to the 79th Precinct in Brooklyn.  Following an interview there, defendant was transported to Binghamton, where he was interviewed again that evening and the following morning.  At the close of the morning interview, defendant provided a written statement in which he admitted that he had shot the victim, but claimed to have done so accidentally.

Following a jury trial, defendant was convicted of murder in the first degree, two counts of murder in the second degree, robbery in the first degree and criminal possession of a weapon in the second degree.  County Court sentenced him to concurrent prison terms of 25 years to life upon his convictions for murder in the first degree and murder in the second degree, 25 years with five years of postrelease supervision upon his conviction for robbery in the first degree and 15 years with five years of postrelease supervision upon his conviction for criminal possession of a weapon in the second degree.  Defendant appeals.

We reject defendant's contention that his motion to suppress his written and oral statements to police should have been granted.  First, County Court properly found that Miranda warnings were not required before police spoke with defendant in the Brooklyn apartment, as he was not in custody.  A defendant is subjected to custodial interrogation, triggering his or her rights under Miranda, when "a reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave" (People v Paulman, 5 NY3d 122, 129 [2005]; accord People v Ortiz, 141 AD3d 872, 874 [2016]).  Factors to be taken into account in this analysis "includ[e] the location, length and atmosphere of the questioning, whether police significantly restricted defendant's freedom of action, the degree of defendant's cooperation, and whether the questioning was accusatory or investigatory" (People v Chaplin, 134 AD3d 1148, 1150 [2015] [internal quotation marks and citations omitted], lv denied 27 NY3d 1067 [2016]).  A court's determination that a

defendant was not in custody "is accorded great weight and will not be disturbed unless clearly erroneous" (People v Strong, 27 AD3d 1010, 1012 [2006] [internal quotation marks and citation omitted], lv denied 7 NY3d 763 [2006]).

The suppression hearing testimony established that the investigators had no reason to suspect that defendant was in the Brooklyn apartment when they went there, planning to interview his girlfriend. After the mother advised them that defendant was sleeping in a bedroom, defendant was asked to come out[1] and Peters spoke with him in the kitchen for about half an hour about his recent presence in Binghamton. Another detective stood at the other end of the kitchen for part of the interview, while the remaining officers searched the apartment with the mother's consent. Defendant was cooperative during the conversation. He was not placed in handcuffs or otherwise physically restrained, no weapons were displayed, and the kitchen and apartment doors were not guarded or blocked. Several other people who were present in the apartment were permitted to speak with defendant during the interview.

As for police testimony to the effect that defendant would have been stopped if he had tried to leave — which he did not do — "[a] police [officer's] unarticulated plan has no bearing on the question whether a suspect was in custody at a particular time . . . [and] the subjective intent of the officer . . . is irrelevant except insofar as it is conveyed to the individual" (People v Ripic, 182 AD2d 226, 234 [1992] [internal quotation marks, brackets and citation omitted], appeal dismissed 81 NY2d 776 [1993]). As there was no evidence that any intent to prevent defendant from leaving was communicated to him, we find no error in County Court's conclusion that his statements during this conversation did not result from a custodial interrogation (see People v Vieou, 107 AD3d 1052, 1053 [2013]; People v Hook, 80 AD3d 881, 882-883 [2011], lv denied 17 NY3d 806 [2011]).

We agree with County Court that defendant knowingly and

---

[1] The testimony was unclear as to whether defendant was called out of the bedroom by the officers or the mother.

intelligently waived his Miranda rights during his subsequent interviews with police in Brooklyn and Binghamton. At the end of the conversation in the Brooklyn apartment, the officers asked defendant to accompany them to the 79th Precinct, and he agreed to do so.[2] Woody and Peters testified that defendant was placed in an interview room upon his arrival, where Woody attempted to read the Miranda rights from a form that listed the pertinent warnings, followed by a summary statement to the effect that defendant understood his rights and a signature line. However, defendant interrupted before Woody was able to read the complete list, stating that he was willing to speak with police but did not "want anything to do with the paper," which he said was not used by Brooklyn police. When Woody attempted to explain the form and complete the reading, defendant continued to insist that he was willing to talk but did not want to use the form. At defendant's request, a Brooklyn detective was brought into the room. He explained that the form was simply a procedure used in Binghamton, but defendant continued to object, and Woody eventually handed the form to defendant to read to himself. Defendant reviewed the form and then objected to the word "statement," which appeared in the text near the end of the document. He reiterated that he was willing to speak with officers but did not want to use the form or sign anything. Woody then set the unsigned form aside and began the interview.

The interview was not recorded because, according to Peters, the necessary equipment was not available; County Court credited the account provided by Woody and Peters, and we defer to that assessment (see People v Carter, 140 AD3d 1394, 1395 [2016], lv denied 28 NY3d 969 [2016]). They stated that the total interview lasted for about 45 minutes, that the Miranda discussion occupied the first 20 minutes of this time and that, despite defendant's interruptions, Woody was able to verbally outline all of the Miranda rights contained on the form, although not necessarily in the same order as they appeared on the

---

[2] Defendant was handcuffed during this trip for the officers' safety and was in custody at this time; however, he was not asked any pertinent questions and made no statements that the People sought to rely upon at trial.

document.  The officers stated that they believed that defendant
was able to read and understand the form because he took an
appropriate amount of time examining it and because of his
objection to a specific word in the text.[3]  His refusal to sign
the form neither constitutes "an implicit invocation of his . . .
Miranda rights" nor precludes a finding that he waived them
(People v Carrion, 277 AD2d 480, 480 [2000], lv denied 96 NY2d
757 [2001]; see People v Setless, 213 AD2d 900, 900-901 [1995],
lv denied 86 NY2d 740 [1995]).  In view of the officers'
testimony and defendant's repeated statements that he wished to
speak with police, we agree with County Court that he waived his
Miranda rights (see People v Ortiz, 141 AD3d at 876).

As for defendant's subsequent statements, "[w]here a person
in police custody has been issued Miranda warnings and
voluntarily and intelligently waives those rights, it is not
necessary to repeat the warnings prior to subsequent questioning
within a reasonable time thereafter, so long as the custody has
remained continuous" (People v Lowin, 36 AD3d 1153, 1154 [2007]
[internal quotation marks, brackets and citations omitted], lv
denied 9 NY3d 847 [2007]; accord People v Booker, 141 AD3d 834,
836 [2016], lv denied 28 NY3d 1026 [2016]).  The police testimony
established that they transported defendant to Binghamton
immediately after the Brooklyn interview and that defendant slept
through most of the six-hour trip.  Immediately after their
arrival in Binghamton at approximately 9:00 p.m., defendant was
interrogated by Woody and another Binghamton detective in a
video-recorded interview that lasted for approximately three
hours.  Woody did not reread the Miranda rights, but reminded
defendant at the outset of the interview that the same rights
applied that had been previously discussed, and stated that the
form would not be presented to defendant again as he had not
wished to sign it earlier.  The other detective asked defendant,
"You did see and hear your rights, right?  You got to see that
form?  You understood it?"  Defendant confirmed that he had.  As
the lapse of time between the Brooklyn and Binghamton interviews

---

[3]  Defendant's ability to read and write was later confirmed
by the fact that he provided a handwritten statement the
following day.

was not unreasonable and defendant had remained in continuous custody, suppression of the evening Binghamton interview was not required (see People v Booker, 141 AD3d at 836; People v Manchester, 123 AD3d 1285, 1288 [2014], lv denied 26 NY3d 931 [2015]; People v Lowin, 36 AD3d at 1154).

Turning to defendant's interrogation on the following morning, which was also video-recorded, two Binghamton officers reminded defendant that warnings had been given to him the day before and began to reread them, but defendant interrupted, asked if it was necessary to go through it all again and stated that he had previously read his own rights and wanted to read them again. The officers gave the form to defendant and he appeared to read it and then turned it over without signing it, stating that he understood his rights and was willing to speak with the officers. Shortly thereafter, he stated that he wished to write his own statement, which he then did. We agree with County Court that, for the same reasons as those pertaining to the Brooklyn interview, defendant affirmatively waived his Miranda rights (see People v Ortiz, 141 AD3d at 876; People v Carrion, 277 AD2d at 480; People v Setless, 213 AD2d at 900-901).

We are unpersuaded by defendant's claim that his confession was rendered involuntary by deceptive or coercive police tactics that were "so fundamentally unfair as to deny due process" (People v Tarsia, 50 NY2d 1, 11 [1980]; accord People v Carnevale, 101 AD3d 1375, 1380 n 3 [2012]). "It is well established that not all deception of a suspect is coercive, [although] in extreme forms it may be" (People v Thomas, 22 NY3d 629, 642 [2014]). Here, none of the few minor deceptive remarks made by the interrogating officers were nearly so "highly coercive" as to nullify a reasonable defendant's judgment or overbear his or her will (id.; see People v Scaringe, 137 AD3d 1409, 1412 [2016], lv denied 28 NY3d 936 [2016]). Likewise, there was no evidence that the police behaved in "an unduly coercive or threatening manner" or made promises that might have unfairly induced a false confession (People v Neal, 133 AD3d 920, 923 [2015] [internal quotation marks and citation omitted], lvs denied 26 NY3d 1107, 1110 [2016]). As for the physical conditions of the interrogation, defendant was in police custody in Brooklyn and Binghamton for a somewhat lengthy period that

spanned an afternoon, an overnight and the following morning. However, the three intervals of actual interrogation during this time — the longest of which was just over three hours — were relatively brief, and he was provided with coffee, food, cigarettes and several opportunities to sleep (see People v Jin Cheng Lin, 26 NY3d 701, 725 [2016]). Considering the totality of the circumstances (see People v Neal, 133 AD3d at 922), the record supports County Court's determination that defendant's statement resulted from his "free and unconstrained choice" (People v Thomas, 22 NY3d at 641 [internal quotation marks and citation omitted]; see People v Cruz, 138 AD3d 1310, 1312 [2016]).

Next, County Court did not abuse its discretion in denying defendant's motion to present expert testimony on false confessions. In the motion — made only a few days before trial was then scheduled to commence[4] — defendant sought to present the trial testimony of Allison Redlich, described as a nationally recognized expert in the field, "to educate the jury regarding the psychological dynamics involved in false confessions" (internal quotation marks omitted). In support of the application, defense counsel argued that the circumstances presented a "classic scenario" for a false confession in that defendant allegedly suffered from certain cognitive and intellectual deficits and was subjected to a lengthy interrogation in unfamiliar surroundings in which police allegedly lied and made promises and misrepresentations. Counsel asserted that Redlich would testify as to the impact of a defendant's diminished intelligence in the context of certain police interrogation techniques, specifically including the Reid interrogation technique, and would also discuss other issues during questioning, including "the use of various props, themes and alternatives." Notably, defense counsel did not assert that any of these techniques, props or themes had been used here. Further, he did not assert that Redlich would offer any opinions regarding defendant's individual personality traits or the particular circumstances of his interrogation, other than to indicate that Redlich would not offer an opinion on the ultimate

_____

[4] The trial was later adjourned for a different reason.

issue of whether defendant's statements were knowing, intelligent and voluntary.

Shortly after County Court denied the motion, the Court of Appeals handed down People v Bedessie (19 NY3d 147 [2012]), in which, for the first time, the Court considered the admissibility of expert testimony on the subject of false confessions. In Bedessie, the Court held that expert testimony on the personality and situational factors associated with false confessions may be helpful to a jury in a proper case, but is admissible only upon a showing that the proposed testimony is "relevant to the defendant and interrogation before the court" (id. at 161). Cases following Bedessie have analyzed the relevancy of such proposed expert testimony based upon "the nature of the interrogation, the applicability of the science of false confessions to the defendant and the extent to which the People's case relie[s] on the confession" (People v Evans, 141 AD3d 120, 126 [2016], lv dismissed 28 NY3d 1101 [2016]; see People v Days, 131 AD3d 972, 979-981 [2015], lv denied 26 NY3d 1108 [2016]). Applying these principles here, we find that the required showing of relevancy was not made, and, thus, the motion was properly denied. As previously noted, defendant sought to have the expert give general testimony about the science of false confessions, but made no claim that defendant's individual circumstances would be addressed (see People v Boone, 146 AD3d 458, ___, 2017 NY Slip Op 00097, *2 [2017]). As also previously discussed herein, the nature of defendant's interrogation was not unduly deceptive or coercive.

Further, the People's case was not premised exclusively or primarily upon defendant's statement (see People v Roman, 125 AD3d 515, 515-516 [2015], lv denied 26 NY3d 1091 [2015]). The People presented the testimony of Kennedy, who stated that he was present at the time of the shooting and that defendant shot the victim and warned Kennedy afterward not to talk about it, as well as the testimony of a fellow inmate who said that defendant told him that he had shot the victim in the face so that he could rob him. Under these circumstances, evidence that defendant had certain cognitive and intellectual deficits, without more, was not enough to establish that the proposed expert testimony was "relevant to this defendant or [his] interrogation" (People v

Bedessie, 19 NY3d at 149; see People v Joubert, 125 AD3d 686, 686 [2015], lv denied 25 NY3d 1166 [2015]; People v Rosario, 100 AD3d 660, 661 [2012], lv denied 20 NY3d 1065 [2013]).

Defendant next contends that County Court improperly usurped the province of the jury in its response to a note submitted during deliberations. The note asked whether defendant could still be found guilty of robbery if the jury found that he was an accomplice. The court read the note to defense counsel and the prosecutor, indicated that its proposed response was "yes," and asked for their feedback. After a brief discussion, both counsel agreed that the court's proposed answer was appropriate. Defendant's present challenge was raised for the first time upon this appeal and is unpreserved. As the court fulfilled its "core responsibility," there was no mode of proceedings error (People v Kisoon, 8 NY3d 129, 134 [2007]; accord People v Woodrow, 89 AD3d 1158, 1159 [2011], lv denied 19 NY3d 978 [2012]; see CPL 310.30; People v LaDuke, 140 AD3d 1467, 1469 [2016]). "Accordingly, preservation was required, and we decline to take corrective action in the interest of justice" (People v Lee, 129 AD3d 1295, 1299 [2015] [citations omitted], lv denied 27 NY3d 1001 [2016]).

Finally, as the People concede, the judgment must be modified, as the two counts of murder in the second degree upon which defendant was convicted are inclusory concurrent counts of the count of murder in the first degree. Defendant was convicted of murder in the first degree upon a count of intentional felony murder pursuant to Penal Law § 125.27 (1) (a) (vii) and (1) (b), and was also convicted of two counts of murder in the second degree consisting of intentional murder pursuant to Penal Law § 125.25 (1) and felony murder pursuant to Penal Law § 125.25 (3). The second degree murder charges were submitted to the jury as lesser included offenses, but the jury was not instructed to consider these charges only if it found that defendant was not guilty of murder in the first degree. In such circumstances, "[a] verdict of guilty upon the greatest count submitted is deemed a dismissal of every lesser count submitted, but not an acquittal thereon" (CPL 300.40 [3] [b]). Accordingly, the convictions for murder in the second degree must be reversed and the corresponding counts of the indictment must be dismissed (see

People v Miller, 6 NY3d 295, 303-304 [2006]; People v Cherry, 46 AD3d 1234, 1238 [2007], lv denied 10 NY3d 839 [2008]; People v Horton, 46 AD3d 1225, 1227-1228 [2007], lv denied 10 NY3d 766 [2008]).

McCarthy, J.P., Lynch, Devine and Mulvey, JJ., concur.

ORDERED that the judgment is modified, on the law, by reversing defendant's convictions of murder in the second degree under counts two and three of the indictment; said counts dismissed and the sentences imposed thereon vacated; and, as so modified, affirmed.

ENTER:

Robert D. Mayberger
Clerk of the Court