■ The People of the State of New York, Respondent, v Ashley N. Carnevale, Appellant. [957 NYS2d 746]—

---

Spain, J.

Defendant was taken into custody around 11:00 p.m. at the home of Carnevale's parents, where she resided with them, Carnevale, her son and their cousin. During an overnight police interrogation, partially recorded on DVDs and spanning at least seven hours and perhaps up to 11 hours, defendant provided two signed statements. Initially, defendant acknowledged being aware that Carnevale took a loaded gun when he reentered But-

ton's house, after stating to her that Button deserved to be "ripped off" for raising his prices. In her second statement, defendant ultimately stated that she and Carnevale had planned to return and shoot both Button and Clark if they refused to "front" them pills during their first visit and that she had provided the ruse for Carnevale's return (i.e., her allegedly forgotten purse).

No request for a *Huntley* hearing or to suppress defendant's statements (*see* CPL 710.20) was made by defense counsel in his omnibus motion.[1] Defendant's written statements were admitted into evidence at her nonjury trial and the DVDs were played for the factfinder and admitted into evidence. Following a nonjury trial at which neither defendant nor Carnevale testified, defendant was convicted, under a joint indictment charging her with acting in concert with Carnevale, of two counts of murder in the second degree (intentional and felony) for the death of Clark, attempted first degree assault (Button), assault in the second degree (Button), and two counts of attempted robbery in the first degree. Carnevale entered a guilty plea to murder and attempted murder in October 2009. Defendant was sentenced to concurrent prison terms, with a maximum of 15 years to life with postrelease supervision, and now appeals.

Initially, while we are not persuaded by defendant's contention that the verdict is against the weight of the evidence, we agree that a new trial is required because she was deprived of meaningful representation at trial (*see People v Ennis*, 11 NY3d 403, 411-412 [2008], *cert denied* 556 US 1240 [2009]; *People v Caban*, 5 NY3d 143, 152-156 [2005]; *People v Benevento*, 91 NY2d 708, 713-714 [1998]; *People v Hobot*, 84 NY2d 1021, 1022 [1995]; *People v Flores*, 84 NY2d 184, 187 [1994]; *People v Rivera*, 71 NY2d 705, 709 [1988]; *People v Baldi*, 54 NY2d 137 [1981]). Since an acquittal would not have been unreasonable, we "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (*People v Bleakley*, 69 NY2d 490, 495 [1987] [internal quotations and citation omitted]). Carnevale's mother testified that defendant and Carnevale were home that evening, defendant was irritable, in pain and arguing with Carnevale regarding Button. She overheard Carnevale say that Button was going to be or deserved to be shot; defendant told him to be quiet. About an hour later, Carnevale's mother overheard defendant ask Carnevale if he had shells or ammunition.

---

1. Defense counsel's omnibus motion included a motion to preclude admission of defendant's statements based upon a lack of notice (*see* CPL 710.30 [3]), which was denied.

They borrowed money for gas around 8:00 p.m. and left, returning a short time later when Carnevale ran into the house briefly to retrieve a gun. Carnevale's father testified that he had refused his son's request that evening to borrow his gun; later, when defendant called home to report hearing gunshots inside Button's home, Carnevale's father discovered that his gun and speed loader were missing. Police later recovered that gun at the scene, which was determined to be the murder weapon. The speed loader was found in the front seat of Carnevale and defendant's car. Carnevale's cousin also testified that he had overheard defendant and Carnevale arguing that evening, defendant was in pain and, about 20 minutes later, he also refused Carnevale's request to borrow one of his guns. Button testified that he was not sure if defendant and Carnevale drove away after their first visit or remained in their car in the driveway. He further testified that Carnevale entered his home alone the second time and he observed defendant remain in the passenger seat of the car until after the shooting, when she fled. En route to the hospital in an ambulance, an injured Carnevale told a police sergeant that defendant had nothing to do with the shooting. Unmistakably, the crucial evidence that defendant shared Carnevale's intent and plan to shoot Button and Clark when he reentered the house came from the admission of defendant's statements to police. Viewing the foregoing evidence in a neutral light, we cannot say that the verdict was contrary to the weight of credible evidence (*see People v Arnold*, 85 AD3d 1330, 1332 [2011]).

"[W]hat constitutes effective assistance is not and cannot be fixed with precision" (*People v Rivera*, 71 NY2d at 708), and requires consideration of whether "the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation" (*People v Baldi*, 54 NY2d at 147). Of course, counsel's failure "to make a particular pretrial motion generally does not, by itself, establish ineffective assistance" (*People v Rivera*, 71 NY2d at 709; *see People v De Mauro*, 48 NY2d 892, 893-894 [1979]; *People v Miller*, 11 AD3d 729, 730 [2004]). Here, however, we are convinced that trial counsel's failure to make a pretrial *Huntley* motion to suppress defendant's oral and written statements to police, at least on voluntariness grounds, or to argue involuntariness to the factfinder, among other deficiencies, deprived defendant of meaningful representation and a fair trial (*see People v Caban*, 5 NY3d at 152; *People v Benevento*, 91 NY2d at 713-714; *People v Hobot*, 84 NY2d at 1022; *People v Miller*, 11 AD3d at 730).

We begin by examining the evidence and testimony adduced

at trial[2] to ascertain whether defense counsel had a colorable basis to move to suppress defendant's statements to police and, if so, whether defendant has demonstrated "the absence of strategic or other legitimate explanations for counsel's failure to request a [*Huntley*] hearing" (*People v Rivera*, 71 NY2d at 709), or to argue involuntariness to the factfinder. It was undisputed that defendant did not reenter Button's home or discharge a gun, that Carnevale reentered alone and shot the victims, and that defendant's culpability is premised upon accessorial liability under Penal Law § 20.00. This required the People to prove that defendant acted with the requisite intent to commit these crimes, i.e., with the intent to kill Clark and cause serious physical injury to and to rob Button, and that she solicited, commanded, importuned, or intentionally aided Carnevale to engage in such conduct (*see* Penal Law § 20.00). Defendant's statements to police, particularly her second statement, were clearly the crucial—arguably indispensable—evidence used by the People to establish that defendant shared Carnevale's plan and intent that he return and shoot Clark and Button if they refused to provide the drugs during the first visit.

The trial testimony is limited on the potential suppression issue given counsel's concomitant failure to argue voluntariness of defendant's statements to the factfinder at trial. The *untested* trial record reflects that defendant, age 20, was handcuffed and taken into custody from her home around 11:00 p.m., received *Miranda* warnings, was transported to the police barracks and placed in an interview room, where she remained isolated during protracted but periodic partially recorded questioning until perhaps approximately 6:30 a.m. or as late as 10:26 a.m. The

**2.** Notably, appellate courts typically, out of necessity, evaluate the *trial* testimony to assess whether a defendant claiming ineffective assistance of trial counsel had a colorable claim for a suppression hearing or to obtain suppression (*see e.g. People v Rivera*, 71 NY2d at 709; *People v Miller*, 11 AD3d at 730). However, the relevant facts are often not fully or even partially developed on the trial record precisely because of the absence of a motion to suppress or a suppression hearing. It is not always possible for appellate courts to reject all legitimate tactical explanations for counsel's failure to pursue a colorable suppression issue, or to ascertain the futility of such a motion; likewise, the claim of ineffectiveness may rest on matters outside the record, leaving as the appropriate remedy a CPL 440.10 motion (*see People v Hobot*, 84 NY2d at 1023; *People v Rivera*, 71 NY2d at 709; *People v Love*, 57 NY2d 998, 999-1000 [1982]; *People v Hamms*, 55 AD3d 1142, 1144 [2008], *lv denied* 11 NY3d 925 [2009]; *People v Zeh*, 289 AD3d 692, 693-695 [2001]). Moreover, an appellate court cannot rely upon trial testimony to determine the actual merits of a potential suppression issue, and we refrain from doing so here (*see People v Millan*, 69 NY2d 514, 518 n 4 [1987]; *People v James*, 67 NY2d 662, 664 [1986]; *People v Gonzalez*, 55 NY2d 720, 721-722 [1981], *cert denied* 456 US 1010 [1982]).

first four pages of her statement (i.e., her first statement) were recorded as having been signed at 2:36 a.m., in which she admitted awareness that Carnevale, on reentry, took a loaded gun into Button's residence. The last (or fifth) page of defendant's statement (i.e., her second statement), in which she relents and admits the shared plan to shoot and kill the victims, is recorded as having been signed at 10:26 a.m., although the interrogating officer who took the statement testified that it was signed at 6:26 a.m., a discrepancy of four hours. It was conceded that the DVD did not capture the entirety of defendant's interrogation and statements, including when she was initially placed in the interview room. While defendant was apparently provided a beverage and offered food, there is no indication that she slept during breaks in the overnight questioning, which extended at least seven hours (11:30 p.m. to 6:30 a.m.) if not 11 or more hours; our review of the DVDs reflects that defendant arguably exhibited signs of noticeable fatigue, including frequent yawning and putting her head down appearing to be almost asleep.

Given the duration, timing and overall circumstances of the custodial questioning, which involved the use of some deception,[3] we find that the defense had a colorable basis for moving to suppress defendant's statements as coerced or on the ground that she did not voluntarily, knowingly and intelligently waive her privilege against self-incrimination or right to counsel (*see Miranda v Arizona*, 384 US 436, 457 [1966]; *People v Mateo*, 2 NY3d 383, 413-414 [2004], *cert denied* 542 US 946 [2004]; *People v Anderson*, 42 NY3d 35, 39-40 [1977]; *see e.g. People v Aveni*, 100 AD3d 228, — [2012]; *People v Thomas*, 93 AD3d 1019, 1021-1028 [2012], *lv granted* 19 NY3d 1105 [2012]; *People v Miller*, 63 AD3d 1186, 1187 [2009]; *People v Cyrus*, 48 AD3d 150, 159-160 [2007], *lv denied* 10 NY3d 763 [2008]; *People v Leonard*, 59 AD2d 1, 12-13 [1977]). Another important factor that should have been explored at a *Huntley* hearing on the issue of voluntariness is whether defendant was in great pain or experiencing symptoms of withdrawal, in view of the testimony regarding her mental and physical condition that evening (*see People v Cyrus*, 48 AD3d at 160; *People v Miller*, 11 AD3d at 730). While we cannot make findings of fact or predict on this record whether the defense would have succeeded in moving to

---

3. The interrogating officer testified that he falsely told defendant early in the interrogation (12:16 a.m.) and several times thereafter that Carnevale incriminated her in the shootings. The test for determining whether deceptive police tactics render a confession involuntary is whether they are "so fundamentally unfair as to deny due process" (*People v Tarsia*, 50 NY2d 1, 11 [1980]; *see People v Thomas*, 93 AD3d 1019, 1022 [2012], *lv granted* 19 NY3d 1105 [2012]).

suppress either or both of her statements had a full record been made (which might have included defendant's own testimony at such a hearing), we find that there were solid, colorable arguments to be made on such a motion that we do not find would likely have been futile (*see People v Jackson*, 48 AD3d 891, 893 [2008], *lv denied* 10 NY3d 841 [2008]) or would have had "little or no chance of success" (*People v Stultz*, 2 NY3d 277, 287 [2004]).

Turning to defendant's burden "to demonstrate the absence of strategic or other legitimate explanations for counsel's failure to request a [*Huntley*] hearing" (*People v Rivera*, 71 NY2d at 709) or to fully develop the circumstances of defendant's interrogations at trial and argue involuntariness to the factfinder, we can perceive of no strategic reason or legitimate tactical explanation for counsel's wholesale surrender to the admission of defendant's incriminating statements (*see People v Miller*, 63 AD3d at 1187-1188; *People v Cyrus*, 48 AD3d at 159-160; *People v Noll*, 24 AD3d 688, 688-689 [2005]; *People v Miller*, 11 AD3d at 730; *see also People v Johnson*, 37 AD3d 363, 364 [2007]). A review of the record reveals that the defense strategy was to argue that defendant did not reenter Button's home, participate in the shootings or ever possess the gun or ammunition, and she remained a passenger, not the get-away driver, until after the shooting. Defense counsel argued that defendant was not responsible for Carnevale's actions and did not know of or share his nefarious intentions upon reentering Button's home. Significantly, the defense theory was supported in part by the trial testimony, namely, that of Button and Carnevale's family. More critically, the defense theory did not require admission of—and was not supported by—defendant's incriminating second statement to the contrary, in which she admitted that if Button and Clark refused to sell them drugs, Carnevale "was going to return to the car and get the gun. Our plan was to shoot them both . . . . We decided they both had to be shot because we could not leave any witnesses." Defendant's statement, particularly the second one, directly contradicted the proffered defense theory that she lacked the shared intent and knowledge of that plan. Thus, counsel could not reasonably have concluded that her statements—in their entirety or even predominantly—were exculpatory (*cf. People v De Mauro*, 48 NY2d at 894; *People v Nguyen*, 90 AD3d 1330, 1333 [2011], *lv denied* 18 NY3d 960 [2012]).

Indeed, defense counsel conceded almost immediately in his opening statement that defendant "made incriminating statements," and later that "[t]he only evidence" she knew what

Carnevale planned came from her own statements. While counsel pointed out that defendant initially denied knowledge of Carnevale's intentions, suggesting that the initial statement was somewhat exculpatory, there was no legitimate strategy employed to explain her subsequent highly incriminating admissions in the second statement. Likewise, while counsel apparently believed there was a real question as to the voluntariness of defendant's statements, repeatedly alluding to a "12-hour" interrogation and briefly eliciting some of the factual circumstances surrounding that questioning which were suggestive of involuntariness, during cross-examination of the interrogating police sergeant, counsel inexplicably never argued the issue of the voluntariness of defendant's statements to the factfinder (*see* CPL 60.45, 710.70 [3]; *People v Hamms*, 55 AD3d 1142, 1143-1144 [2008], *lv denied* 11 NY3d 925 [2009]; *see also People v Combest*, 4 NY3d 341, 347-348 [2005]).

Another troubling issue concerns Button's testimony that, when he asked Carnevale after the shooting why he had shot them, Carnevale said, "You knew we were in pain and you won't help us out so *we decided this is what we had to do*" (emphasis added). This damaging statement implicating defendant in Carnevale's plan was clearly hearsay offered to prove its truth—i.e., that Carnevale (who did not testify at defendant's trial) and defendant together planned and intended the shootings. However, no hearsay or confrontation clause objections were registered by defense counsel, and no hearsay exception appears to apply (*see Davis v Washington*, 547 US 813, 822 [2006]; *People v Duhs*, 16 NY3d 405, 408-409 [2011]; *cf. People v Pagan*, 97 AD3d 963, 967-968 [2012]).

This is, then, a "rare case" in which it is possible to reject—from the trial record alone—all legitimate explanations for counsel's failure, among others, to pursue a colorable suppression issue (*People v Rivera*, 71 NY2d at 709). The totality of circumstances reveals that defense counsel engaged in a prejudicial course of conduct, the cumulative effect of which deprived defendant of meaningful representation and a fair trial. As the harmless error doctrine is inapplicable "in cases involving substantiated claims of ineffective assistance" (*People v Benevento*, 91 NY2d at 714; *see People v Ennis*, 11 NY3d at 412; *People v Miller*, 63 AD3d at 1188), defendant is entitled to a new trial.

Lahtinen, Kavanagh and McCarthy, JJ., concur.

Rose, J.P. (concurring in part and dissenting in part). While I agree that the verdict was not contrary to the weight of the evidence, I cannot agree that defendant was denied the effective

assistance of counsel. As acknowledged by the majority, failure "to make a particular pretrial motion generally does not, by itself, establish ineffective assistance" (*People v Rivera*, 71 NY2d 705, 709 [1988]; *see People v Perea*, 27 AD3d 960, 961 [2006]; *People v Longshore*, 222 AD2d 941, 942 [1995], *lv denied* 88 NY2d 850 [1996]). Nor is this, in my view, that "rare case" where a single error of counsel results in the deprivation of the right to the effective assistance of counsel (*People v Turner*, 5 NY3d 476, 478 [2005]). Even accepting that there is at least a colorable basis upon which a motion to suppress could have been made, "[t]here can be no denial of effective assistance of trial counsel arising from counsel's failure to 'make a motion or argument that has little or no chance of success' " (*People v Caban*, 5 NY3d 143, 152 [2005], quoting *People v Stultz*, 2 NY3d 277, 287 [2004]). The video recording of defendant's interview with the State Police effectively establishes that there is no basis to suppress defendant's statements (*see People v Hoffler*, 74 AD3d 1632, 1636 [2010], *lv denied* 17 NY3d 859 [2011]; *People v Perea*, 27 AD3d at 961; *People v Clifford*, 295 AD2d 697, 698 [2002], *lv denied* 98 NY2d 709 [2002]; *People v Vecchio*, 228 AD2d 820, 820-821 [1996]). "[C]ounsel should not be criticized for failing to pursue a potentially futile endeavor" (*People v Vecchio*, 228 AD2d at 821).

Furthermore, while defendant's statement was no doubt a crucial piece of evidence, it was not the sole basis for the People's case against her. The People also relied on the circumstantial evidence that tended to establish defendant's knowledge and participation in the plan to kill both victims in order to steal Vicodin pills. The record also reveals that counsel was otherwise prepared, presented a plausible defense and meaningfully participated in the trial by giving cogent opening and closing statements, cross-examining key witnesses and raising appropriate objections (*see e.g. People v McRobbie*, 97 AD3d 970, 972 [2012]; *People v Jones*, 77 AD3d 1170, 1173 [2010], *lv denied* 16 NY3d 896 [2011]). Accordingly, I would affirm the judgment. Ordered that the judgment is reversed, on the law, and matter remitted to the County Court of Broome County for a new trial.