People v Wilson (2018 NY Slip Op 05715)





People v Wilson


2018 NY Slip Op 05715


Decided on August 9, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: August 9, 2018

107516

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
CASEY WILSON, Appellant.

Calendar Date: June 1, 2018

Before: McCarthy, J.P., Lynch, Devine, Clark and Rumsey, JJ.


Catherine A. Barber, Guilderland, for appellant.
Weeden A. Wetmore, District Attorney, Elmira (Susan Rider-Ulacco of counsel), for respondent.



MEMORANDUM AND ORDER
Clark, J.
Appeals (1) from a judgment of the County Court of Chemung County (Hayden, J.), rendered November 3, 2014, upon a verdict convicting defendant of the crimes of burglary in the first degree (two counts), rape in the first degree (two counts), criminal sexual act in the first degree (two counts), aggravated sexual abuse in the third degree (two counts) and robbery in the first degree, and (2) from a judgment of said court, rendered December 1, 2014, convicting defendant upon his plea of guilty of the crime of burglary in the second degree.
Defendant was charged in a 10-count indictment with various offenses arising out of a series of masked burglaries committed on June 15, 2011, September 29, 2013 and November 26, 2013.
Following arraignment, defendant successfully moved to, among other things, sever count 8 of the indictment, which charged him with burglary in the second degree and was the sole charge arising out of the November 2013 incident (see CPL 200.20 [3]). The matter thereafter proceeded to a jury trial on the remaining nine counts of the indictment, which arose out of the June 2011 and September 2013 incidents. Defendant was ultimately convicted of all nine counts — specifically, two counts of burglary in the first degree, two counts of rape in the first degree, two counts of criminal sexual act in the first degree, two counts of aggravated sexual abuse in the third degree and one count of robbery in the first degree. County Court subsequently sentenced defendant to an aggregate prison term of 25 years, followed by 10 years of postrelease [*2]supervision [FN1]. Immediately following sentencing, defendant pleaded guilty to the severed charge — burglary in the second degree — and he was sentenced to a prison term of 15 years followed by five years of postrelease supervision, to be served concurrently with the sentences for the other convictions. Defendant now appeals from both judgments of conviction.
Initially, we find no merit to defendant's contention that his convictions are not supported by legally sufficient evidence and are against the weight of the evidence. In reviewing a legal sufficiency claim, "we view the evidence in the light most favorable to the People and evaluate whether 'there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged'" (People v Robinson, 156 AD3d 1123, 1124 [2017], lv denied 30 NY3d 1119 [2018], quoting People v Bleakley, 69 NY2d 490, 495 [1987]). In contrast, a weight of the evidence analysis requires us to first determine, based on all of the credible evidence, whether a different result would have been unreasonable and, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence (see People v Danielson, 9 NY3d 342, 348 [2007]; People v Bleakley, 69 NY2d at 495; People v Perry, 154 AD3d 1168, 1169 [2017]).
Turning first to the June 2011 incident, the 2011 victim testified that, on the morning in question, she awoke around 5:00 a.m. to a tall man — dressed in dark clothes and wearing a bandana over the bottom half of his face — standing in her bedroom doorway with a knife. She stated that, as she began to scream, the individual charged and climbed on top of her, covered her face with a pillow and threatened to kill her if she looked at him. According to the 2011 victim, the individual then asked whether she had any money or marihuana in the apartment, to which she replied that she did not. She testified that the individual thereafter instructed her to roll over onto her stomach and, after putting on what she believed to be a condom and rubbing a sticky substance on her vaginal area, raped her. She stated that when he was finished, he threatened to come back and kill her if she disclosed the assault. The 2011 victim asserted that her assailant's eyes looked "familiar" and that she knew her assailant to be defendant as soon as she heard his voice, which she described as "high-pitched." She also stated that her attacker, like defendant, was tall, skinny, not white or black, but of "mixed race," and had long, skinny fingers. She explained that she knew defendant through her boyfriend, with whom she lived, that defendant had been a frequent visitor to her home and that she was therefore familiar with his appearance, voice and manner of speaking. The 2011 victim additionally stated that defendant had previously smoked marihuana in her apartment and that she had seen defendant wear a bandana over his face in a fashion similar to the attacker.
The subsequent police investigation revealed that the attacker had gained entry into the home through a kitchen window, but that no fingerprint evidence could be recovered from the window. The boyfriend testified that defendant had been at the apartment the evening before the attack until roughly midnight, when defendant left to meet up with a romantic interest. The boyfriend also testified that he received a call from an unknown number on the morning of the [*3]attack and that he later asked defendant if he had called from the unknown number. According to the boyfriend, defendant responded that he had called, that he had been "in the wrong place at the wrong time" and that he had been mixed up in a different home burglary, allegedly at a different house on the 2011 victim's street. Although a sex offense evidence kit was obtained from the 2011 victim, analysis of the collected evidence indicated only the presence of DNA from the 2011 victim. Defendant, who testified on his own behalf, denied assaulting the 2011 victim.
In our view, the foregoing evidence, viewed in the light most favorable to the People, provided a valid line of reasoning and permissible inferences from which a rational juror could conclude that defendant committed burglary in the first degree by knowingly entering the 2011 victim's home with the intent to commit a crime therein and threatening her with a knife (see Penal Law § 140.30 [3]; People v Ramos, 129 AD3d 1205, 1206 [2015], lv denied 26 NY3d 971 [2015]; People v Woodrow, 91 AD3d 1188, 1189-1190 [2012], lv denied 18 NY3d 999 [2012]), as well as rape in the first degree by using forcible compulsion to engage in sexual intercourse with the 2011 victim (see Penal Law
§§ 130.00 [8]; 130.35). Accordingly, with respect to the June 2011 incident, we find that defendant's convictions on the charges of burglary in the first degree and rape in the first degree are supported by legally sufficient evidence. As to defendant's weight of the evidence challenge, we find that it would not have been unreasonable for the jury to have acquitted defendant of the charges arising out of the June 2011 incident, given defendant's denial of the charges and the absence of fingerprint or DNA evidence. However, viewing the evidence in a neutral light and according deference to the jury's credibility assessments (see People v Mateo, 2 NY3d 383, 410 [2004], cert denied 542 US 946 [2004]), we find defendant's convictions to be supported by the weight of the credible evidence (see People v Glass, 150 AD3d 1408, 1409-1410 [2017], lv denied 30 NY3d 1115 [2018]; People v Ramos, 129 AD3d at 1206-1207; People v Woodrow, 91 AD3d at 1189-1190).
We reach a similar conclusion with respect to the charges arising out of the September 2013 incident. The 2013 victim testified that defendant came to her home around 5:00 a.m. on the day in question to meet his girlfriend, who had been at her apartment for a few hours. The 2013 victim stated that, although she did not see defendant, she heard his voice and was informed by defendant's girlfriend that it was defendant at the door. The 2013 victim testified that she fell asleep on the couch while defendant and his girlfriend spoke outside and that she was awoken around 7:00 a.m. by someone pushing her face into the couch. She asserted that this individual then put a knife to her face with a gloved hand and threatened to stab her if she did not remain quiet. According to the 2013 victim, the masked individual blindfolded her and brought her upstairs to her bedroom in a manner that led her to believe that he was familiar with the layout of her home. She stated that, once they were upstairs, the individual forced her to perform oral sex on him and vaginally and anally raped her. The 2013 victim testified that, before any sexual contact, the individual put on a condom that he retrieved at her direction from her dresser drawer. She stated that the individual brought her downstairs after the assault and, after forcing her to lay on her stomach, inserted an object — which he claimed was a douche — into her vagina and anus, followed by his fingers. According to the 2013 victim, the individual then stole a small amount of cash and fled. She described her attacker as tall, skinny and dressed in a red sweatshirt, dark jeans, dark sneakers and a ski mask. She stated that, although the individual attempted to disguise his voice, she recognized the voice as that of defendant, who had been a guest at her home roughly twice a week in the months leading up to the attack. She stated that she reported the attack to law enforcement, identified defendant as her assailant and submitted to a sexual offense evidence kit at the hospital.
During the ensuing investigation, police recovered various physical evidence from the scene, including a Lifestyle condom wrapper. The testimony established that, prompted by the 2013 victim's identification of defendant as her assailant, police spoke with defendant shortly after 8:00 a.m. on the morning of the attack, that he voluntarily accompanied them to the police station for questioning and that a pat down of defendant's person for officer safety revealed that defendant had an unopened Lifestyle condom and $40 in cash. The evidence also established that defendant consented to a buccal swab and a search of his room. While a red hooded sweatshirt was not recovered during that search, defendant's aunt — with whom he lived — testified that she was missing a red sweatshirt. Additionally, the officer who interviewed defendant testified that defendant acknowledged meeting his girlfriend at the victim's apartment earlier that morning, but claimed that he had been returning a key to a friend when the crimes occurred. That friend, however, testified that defendant never had a key to his apartment and that he did not see defendant on the morning in question. The friend also testified that, when he confronted defendant on this issue, defendant stated that he had lied because he did not want his girlfriend to know that he had been with another woman.
The evidence also demonstrated that the police secured relevant surveillance footage from outside the 2013 victim's apartment, as well as a bar parking lot adjacent to defendant's home. The footage from the apartment complex, which was admitted into evidence and played for the jury, depicted an individual arriving at the 2013 victim's apartment at 4:52 a.m., speaking with another individual for awhile and eventually the two leaving together at 6:15 a.m. The footage also depicted an individual — wearing a red hooded sweatshirt, jeans and black and white sneakers — enter the 2013 victim's apartment at 7:15 a.m. and leave the premises at 7:46 a.m. in the same clothes, but wearing lavender gloves and a face mask and carrying an unknown object. The footage from the bar parking lot showed an individual riding a bicycle past the establishment at 8:00 a.m. wearing a red hooded sweatshirt. Defendant's aunt and uncle both testified that they recognized defendant as the person riding the bicycle in this footage, and the uncle testified that the bicycle had been a gift intended for his stepdaughter.
With respect to the forensic evidence, a State Police forensic scientist testified that the vulvar, vaginal and cervical swabs taken from the 2013 victim tested positive for sperm and that the recovered DNA profiles were found to be consistent with a mixture of DNA from the 2013 victim and her boyfriend. Defendant was excluded as a contributor from all three of these samples. Additionally, the DNA profiles recovered from swabs of the outside of the condom wrapper were consistent with three individuals, one of whom was male. However, due to the complexity of the genetic information, no one could be included or excluded as a contributor.
Further, as established by the evidence, lavender gloves were discovered not far from the 2013 victim's apartment and swabs taken from both the outside and inside of the gloves were subjected to forensic testing conducted by the State Police Forensic Investigation Center. That testing excluded defendant as a contributor to the DNA profiles recovered from the outside of the gloves. The DNA profile recovered from the inside of one of the gloves was consistent with the 2013 victim's DNA, admixed with at least two additional donors, but did not have "enough additional DNA" to reach any conclusions as to the minor contributors. The DNA profile recovered from the inside of the other glove was consistent with at least three donors, one of whom was male, but was too complex to include or exclude anyone. The State Police forensic scientist testified that, given his inability to reach any conclusions with respect to the DNA profiles recovered from inside the gloves under State Police methods used at that time, he recommended to the prosecutor that those DNA profiles be sent to a private company — Cybergenetics — to be analyzed using the TrueAllele Casework system, a proprietary computer program that interprets complex DNA evidence to "determine match statistics" between [*4]recovered DNA profiles and known individuals. Mark Perlin, the chief scientific officer and chief executive officer of Cybergenetics, testified that the TrueAllele Casework system was able to analyze DNA ordinarily disregarded by human analysts to determine whether there was a match between the DNA evidence recovered from the inside of the gloves and defendant. Specifically, Perlin testified that a match between defendant and the DNA profile recovered from the inside of one of the gloves was 31.3 million times more probable than a coincidental match to an unrelated black person. As to the DNA profile recovered from the inside of the other glove, Perlin stated that it was 817,000 times more probable than a coincidence that it was a match to defendant.
While testifying on his own behalf, defendant denied having attacked the 2013 victim. He acknowledged that he was the individual in the bar surveillance footage riding a bicycle past the bar at 8:00 a.m., but asserted that he was not the individual depicted in the apartment complex footage at 7:15 a.m. and 7:46 a.m. He stated that, at that time, he had ridden his bicycle to a nearby park to take bath salts. Defendant further testified that he had "similar" lavender gloves to the ones found outside the apartment complex and that he may have left them at the 2013 victim's home that morning.
Viewing the foregoing trial evidence in the light most favorable to the People, we conclude that there is a valid line of reasoning and permissible inferences that could lead a rational juror to conclude that, with respect to the September 2013 incident, defendant committed burglary in the first degree (see Penal Law § 140.30 [3]; People v Ramos, 129 AD3d at 1206), rape in the first degree (see Penal Law § 130.35 [1]), two counts of criminal sexual act in the first degree (see Penal Law
§ 130.50 [1]), two counts of aggravated sexual abuse in the third degree (see Penal Law § 130.66 [1] [a]) and robbery in the first degree (see Penal Law § 160.15 [3]). As such, we find that these convictions are supported by legally sufficient evidence. Moreover, we are satisfied that each of defendant's convictions arising out of the September 2013 incident are supported by the weight of the credible evidence (see People v Glass, 150 AD3d at 1409-1410; People v Ramos, 129 AD3d at 1206; People v Lancaster, 121 AD3d 1301, 1303-1304 [2014], lv denied 24 NY3d 1121 [2015]).
However, we agree with defendant that defense counsel's failure to request a Frye hearing on the TrueAllele Casework system constituted ineffective assistance of counsel. In assessing a claim of ineffective assistance of counsel, we consider whether "the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation" (People v Baldi, 54 NY2d 137, 147 [1981]; see People v Honghirun, 29 NY3d 284, 289 [2017]). Generally, the failure to make a certain pretrial motion will not, without more, constitute ineffective assistance of counsel (see People v Rivera, 71 NY2d 705, 709 [1988]; People v Vonneida, 130 AD3d 1322, 1323 [2015], lv denied 26 NY3d 1093 [2015]; People v Carnevale, 101 AD3d 1375, 1378 [2012]). However, "[i]n the rare case," counsel will be deemed ineffective for failing, in the absence of strategic or other legitimate explanations, to pursue a colorable claim (People v Rivera, 71 NY2d at 709; see People v Carver, 27 NY3d 418, 420 [2016]; People v Garcia, 75 NY2d 973, 974 [1990]).
Defendant asserts that his trial counsel should have challenged, by way of a Frye hearing, the reliability of the TrueAllele Casework system, the proprietary "computer program that use[d] mathematics and statistics to interpret" the electronic data generated from the DNA mixtures taken from the lavender gloves and determine the statistical probability of a match between defendant's DNA and that found on the inside of the gloves. A Frye hearing ascertains [*5]the reliability of "novel scientific evidence" by determining "whether the accepted techniques, when properly performed, generate results accepted as reliable within the scientific community generally" (People v Wesley, 83 NY2d 417, 422 [1994]; see Frye v United States, 293 F 1013, 1014 [1923]; Parker v Mobil Oil Corp., 7 NY3d 434, 446 [2006]). At the time of defendant's pretrial proceedings in 2014, there were no reported trial court or appellate court decisions in this state establishing that the reliability of the TrueAllele Casework system had been assessed through a Frye hearing or that any court in the state had otherwise accepted expert testimony regarding that proprietary computer program (see People v Wakefield, 47 Misc 3d 850, 851 [Sup Ct, Schenectady County 2015]; compare People v Middleton, 54 NY2d 42, 49-50 [1981]; People v Magri, 3 NY2d 562, 566 [1958]). Given these circumstances, we do not find that it would have been futile for defense counsel to have requested a Frye hearing to challenge the reliability of the TrueAllele Casework system or that such an application would have had little or no likelihood of success (see generally People v Carnevale, 101 AD3d at 1381). While we cannot determine whether the results of the testing performed by the TrueAllele Casework system would have been found to be reliable within the scientific community in 2014 had a Frye hearing been timely requested and held, defense counsel did have a colorable basis upon which to request a Frye hearing (see generally People v Zeh, 144 AD3d 1395, 1397-1398 [2016], lv denied 29 NY3d 954 [2017]; People v Carnevale, 101 AD3d at 1378; People v Vega, 276 AD2d 414, 414 [2000]).
Moreover, we can discern no reasonable trial strategy or legitimate explanation for defense counsel's failure to request a Frye hearing. It is evident from the record that Perlin testified before the grand jury regarding the TrueAllele Casework system and that, at some point during pretrial proceedings, the People informed defendant of their intention to present Perlin's expert testimony at trial. Perlin's expert testimony provided the only definitive DNA evidence connecting defendant to the crimes perpetrated against the 2013 victim. Thus, defense counsel had every reason to challenge the reliability of the TrueAllele Casework system. Indeed, had the TrueAllele Casework system been found to be unreliable after a Frye hearing, Perlin's testimony would have been rendered inadmissible, which, in turn, would have weakened the People's case against defendant. In light of the fact that defense counsel "had everything to gain and nothing to lose" by challenging the admissibility of Perlin's expert testimony (People v Velez, 138 AD3d 1041, 1042 [2016], lv denied 28 NY3d 938 [2016]; accord People v Zeh, 144 AD3d at 1397-1398), "we can perceive no strategic reason or legitimate tactical explanation for counsel's wholesale surrender to the admission" of Perlin's expert testimony regarding TrueAllele-derived DNA evidence (People v Carnevale, 101 AD3d at 1381). Accordingly, in the absence of strategic or other legitimate explanations for defense counsel's failure to pursue a colorable request for a Frye hearing, we find that the circumstances of this case present us with one of those rare instances in which defense counsel's sole failure — in an otherwise proficient representation — constituted ineffective assistance of counsel (see People v Zeh, 144 AD3d at 1397-1398; People v Carnevale, 101 AD3d at 1382). In light of our determination, we hold the appeal from the November 2014 judgment in abeyance and remit the matter to County Court for a posttrial Frye hearing to consider the reliability of the TrueAllele Casework system as it was when the analysis was performed in 2013 and report back on its findings (see generally People v Roraback, 242 AD2d 400, 406 [1997], lvs denied 91 NY2d 878, 879 [1997]). Pending County Court's determination upon remittal, we withhold decision on the remaining issues raised by defendant in connection with his appeal from the November 2014 judgment of conviction.
As to the December 2014 judgment of conviction entered upon defendant's guilty plea, we agree with defendant that he did not knowingly, voluntarily and intelligently enter into his plea because County Court failed to advise him that he would be subject to a period of postrelease supervision before accepting his plea or at any other time prior to imposing his [*6]sentence (see People v Louree, 8 NY3d 541, 545-546 [2007]; People v Watkins, 140 AD3d 1206, 1206-1207 [2016]; see generally People v Peque, 22 NY3d 168, 182-183 [2013], cert denied ___ US ___, 135 S Ct 90 [2014]; compare People v Crowder, 24 NY3d 1134, 1136-1137 [2015]; People v Murray, 15 NY3d 725, 726-727 [2010]). Accordingly, we reverse the December 2014 judgment of conviction and remit for further proceedings in accordance with this decision.
McCarthy, J.P., Lynch, Devine and Rumsey, JJ., concur.
ORDERED that, on the appeal from the judgment rendered November 3, 2014, the 
decision is withheld, and matter remitted to the County Court of Chemung County for further proceedings not inconsistent with this Court's decision.
ORDERED that the judgment rendered December 1, 2014 is reversed, on the law, and matter remitted to the County Court of 
Chemung County for further proceedings not inconsistent with this Court's decision.



Footnotes

Footnote 1: County Court initially imposed 10 years of postrelease supervision on the burglary and robbery convictions, but subsequently corrected that illegal sentence and imposed the required five-year period of postrelease supervision (see Penal Law § 70.45 [2]).